NO. _A-08020 7-C_

| CLOEREN INCORPORATED | § | IN THE DISTRICT COURT OF |
|---|---|---|
| VS. | § | ORANGE COUNTY, TEXAS |
| GARY OLIVER AND EXTRUSION DIES INDUSTRIES, LLC | § | _28th_ JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION,
### APPLICATION FOR TEMPORARY RESTRAINING ORDER
### AND APPLICATION FOR TEMPORARY INJUNCTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, CLOEREN INCORPORATED, hereinafter sometimes referred to as "Cloeren", and files this its Original Petition, Application for Temporary Restraining Order and Application for Temporary Injunction, complaining of GARY OLIVER AND EXTRUSION DIES INDUSTRIES, LLC, and in support of said Complaint and Applications would respectfully show unto the Court as follows:

#### I.
#### Discovery Level

Plaintiff elects to complete discovery pursuant to Level III of Rule 190 of the Texas Rules of Civil Procedure.

#### II.
#### Party

Plaintiff, Cloeren Incorporated, is a Texas corporation with its principal place of business located in Orange, Orange County, Texas.

Defendant, Gary Oliver, is an individual who, at the time of the events made the basis of this cause of action, was a Texas resident residing in Orange, Orange County, Texas, but based upon information and belief, may, at this time, be a Wisconsin resident. Oliver may be served with process at the place of his current employment at Extrusion Dies Industries, LLC located at 911 Kurth Road, Chippewa Falls, WI 54729-1443.



Defendant, Extrusion Dies Industries, LLC is a foreign limited liability company, with its principal place of business located in Wisconsin, and may be served with process by serving its registered agent, Timothy Callahan, at 911 Kurth Road, Chippewa Falls, WI 54729-1443.

### III.
### Venue

Venue is proper in the District Court of Orange County, Texas in that all or a substantial portion of the events which made the basis of the instant cause of action occurred in Orange, Orange County, Texas. In addition, the contractual obligations in part made the basis of the instant cause of action were executed and approved by the parties in Orange, Orange County, Texas and were performable, at least in part, in Orange, Orange County, Texas.

### IV.
### Background Facts – Cloeren and the Extrusion Industry Generally

Cloeren Incorporated, with its principal offices and principal manufacturing facilities located in Orange, Orange County, Texas, is involved in the extrusion business, including particularly a subpart of the extrusion industry. This subpart involves the manufacture of extrusion heads, including particularly extrusion dies manufactured for utilization in the polymer extrusion industry. The extrusion industry generally, includes, without limitation, products used for or in food, industrial and medical packaging, personal hygiene, aero space, automotive, consumer goods and appliances, housing and construction, and food stuffs. The extrusion industry represents approximately a 100 billion dollar annual market. The one component of the extrusion industry in which Cloeren is primarily involved is the extrusion head industry, which involves the manufacture of extrusion heads utilized in polymer extrusion. The extrusion head manufacturing component of the extrusion industry represents approximately less than 0.5%, if not less, of the total extrusion industry. Extrusion heads include, by way of example, extrusion dies, feed blocks and related accessories and processes, with a total market of approximately 170 million dollars annually. The extrusion heads manufactured by companies such as Cloeren are components utilized in the extrusion process that are highly technical and sophisticated. The design, manufacture, service

2

and operation of such extrusion heads involve designs, processes, procedures and know how that involve substantial and valuable proprietary interests of the various extrusion head manufacturing companies which design and manufacture said components, including Plaintiff Cloeren.

Cloeren is generally recognized in the extrusion industry and in the extrusion head component of the extrusion industry as the leader in the extrusion head segment. Cloeren's sales of extrusion head products, services and technology involve sales that are on a world wide basis including substantial sales within both the domestic market and the foreign market. Cloeren, like all companies involved in the extrusion head manufacturing business component of the extrusion industry, closely guards its proprietary and confidential information, which is necessary to not only protect the interests of its customers, but also to protect the competitive advantage that Cloeren has generated over its other competitors in the extrusion head market through substantial investments in research and development that enhance the design and manufacturing processes and that also enhance the post manufactured servicing provided by Cloeren, all of the foregoing of which has enhanced, through substantial investment, Cloeren's market position as opposed to its other competitors in the extrusion head industry.

## V.
## Cloeren Trade Secrets

Cloeren's proprietary information includes patented and patent pending products and processes within the extrusion head manufacturing industry including patented and patent pending products and processes related to extrusion dies, feed blocks and related ancillaries and processes. In addition to the foregoing, Cloeren's proprietary information also includes innumerable products, processes and procedures that have not been patented for various reasons, which decisions to patent or to not patent involves issues pertaining to know how and other information that are highly confidential and proprietary trade secrets to Cloeren. Access to this and other proprietary and confidential information, including without limitation, customer types, name and contacts, customer lists, potential customers, potential projects, marketing plans, key

3

employees and associates, manufacturing capacity, methods and specifications, key suppliers, and supply specifications is closely controlled and monitored, which information will be referred to hereinafter as the "Proprietary and Confidential Information" and/or or "Cloeren's Trade Secrets" and/or "P&C Information". Access to the foregoing has at all times been closely contained, controlled and monitored by Cloeren including its upper management, with access to said information limited to select management personnel and other selected persons on a continuously reviewed and refined "need to know" basis. In addition to controlling access to the P&C Information, including the Cloeren Trade Secrets, the Company also requires that its employees, including particularly employees with access to said information, execute Secrecy Agreements which detail the obligations of the employees to maintain the confidentiality of said Trade Secret Information and further obligates the employees to not utilize or otherwise disclose said Trade Secret Information, directly or indirectly, inherently or inevitably, to any third parties who may or may not utilize the information against the interests of the Company, including, without limitation, precluding disclosure, directly or indirectly, inherently or inevitably, of said confidential and proprietary information to Plaintiff's competitors. The disclosure of said information to third parties, including Cloeren's competitors, would clearly result in immediate and irreparable harm to the Company including harm for which Cloeren could not be adequately compensated though recovery of damages of a pecuniary nature. Further, Cloeren would show that the disclosure of said Confidential and Proprietary Information and/or the threat of same would create a situation whereby Cloeren would be faced with no adequate remedy at law due to the fact that the pecuniary value of said proprietary and confidential information is incalculable and due to the further fact that even if said unauthorized disclosure and/or misappropriation of confidential proprietary information could be assessed a pecuniary value, the ability of employees and/or former employees of Cloeren to pay said pecuniary value would be highly improbable, if not impossible.

4

## VI.
## Gary Oliver Employment

Plaintiff would show that Defendant, Gary Oliver, was a long standing employee of Plaintiff Cloeren, with said employment relationship between Defendant Oliver and Cloeren dating back to 1990. In fact, Oliver's relationship with Cloeren preexisted his employment relationship, with said relationship beginning at least as early as the mid 1980's incident to Oliver's then position as an employee of one of Cloeren's customers. Prior to his employment with Cloeren, Oliver's employment background was primarily in the chemical and food packaging industry, with his previous employment being primarily with Dow Chemical and Ball Corporation. Prior to his association with Cloeren, Oliver had limited experience, expertise or training, of any kind, if any, in the extrusion head manufacturing business, including, without limitation, the extrusion design and manufacturing business and the related feed block business. Oliver began his employment with Cloeren in 1990 as a direct report and confidant to the President and Chief Executive Officer of Cloeren, namely Peter Cloeren, and was a member of Cloeren's "inner circle", which inner circle included upper management of the Company that was involved, on a day to day basis, in the development of processes, procedures and products, and the sale of the foregoing necessary to enhance the Company's presence in the industry, all of which information was not only confidential, but also of proprietary nature. Oliver routinely had access to said sensitive and confidential information that was and is not known by the general public, competitors of Cloeren, and was in fact not known by most other employees of the Company, including information that has been defined hereinabove as the "Cloeren Trade Secrets", the "proprietary and confidential information" and/or the "P&C Information". Oliver's involvement and access to said proprietary and confidential information is such that he was involved, from time to time, in assisting Cloeren in the submission and acquisition of patents and more importantly, was involved in assisting Cloeren, its legal team and others in the decision, from time to time, as to which products, processes and procedures would not be patented for fear of inadvertent disclosure to third parties, including, without limitation,

competitors of Cloeren.  In fact, it is safe to say that the confidential information which Oliver received as a result of his employment with Cloeren involved much or substantially all of the information, processes and procedures that would constitute Cloeren's Trade Secrets, including process secrets, know how, development technology and the thought processes of the Company, its principals, primary management team and its Chief Executive Officer.  This access to trade secret information included not only designs, manufacturing and marketing processes and procedures that were developed while Oliver was employed by the Company, but also include access to information, including proprietary and confidential information, regarding past product design, processes and procedures, manufacturing procedures, as well as proposed future product designs, processes and procedures and improvements to same, and marketing strategies related to the foregoing.  Such information was at all times known by Cloeren, and others receiving same, as information that was confidential and proprietary to the interests of Cloeren and information that clearly and unequivocally constituted Trade Secrets of Cloeren.  Oliver acknowledged, at all times, his duty and willingness to maintain the Cloeren Trade Secret Information, including the Proprietary and Confidential Information, confidential at all times, and to not disclose same, directly or indirectly, inherently or inevitably, to any third parties and incident to same, Oliver acknowledged clearly and unequivocally, that part and parcel of his receipt of and access to said Proprietary and Confidential Information was that he would not be willing to, nor would he be able to, accepted employment, in the future, with direct competitors of Cloeren in the extrusion head manufacturing component of the extrusion industry for a period of at least three years after termination.

## VII.
## Secrecy Agreement

Incident to Oliver's employment with Cloeren, and as a precondition to his receipt of and access to proprietary and confidential information, Oliver executed Secrecy Agreements in favor of Cloeren, which Secrecy Agreements were executed in 1990 and 1992 and are attached to the Affidavit of Peter Cloeren attached hereto and identified as Exhibits "A" and "B" to said Affidavit,

6

respectively.   These Agreements include numerous provisions, including, without limitation, detailed nondisclosure obligations, detailed non-solicitation provisions, and covenants not to compete.  Plaintiff would show that Oliver was well aware of the terms and conditions of said Agreements, and executed same freely and involuntarily.  Further, Plaintiff would show that Oliver had signed previous agreements with his previous employers that contained similar provisions to those detailed with the Cloeren Secrecy Agreements.  More particularly, the Agreements provide, among other things, that Oliver "will not undertake any employment competitive with or in conflict with the interests of the Company wherein the complete unhampered fulfillment of the duties of that employment will inherently or inevitably fall upon me to reveal, to base judgment upon, or to use such confidential information or trade secrets".  The Agreements further provide that Oliver "will not directly or indirectly, or by aid to others, do anything which would tend to divert from the Company any trade or business (a) with any customer with whom I had contact or association during one year next preceding termination of my company employment, or (b) with any parties whose identity or potentials as a customer is confidential and learned by me at any time during my employment".  Oliver further agreed that "for so long as any such confidential information and trade secrets will remain confidential, secret or otherwise, wholly or partially protectable either during or after my employment, I will not use or divulge such information except as permitted or required by the duties of my Company employment".  Plaintiff would show that Oliver was well aware of the fact that but for his execution of the Secrecy Agreements attached to the Cloeren Affidavit, he would not have been provided access to the Cloeren Proprietary and Confidential Information which constitutes Cloeren's Trade Secrets and incident to the foregoing, Oliver freely and voluntarily executed said Agreements knowing full well the implications of same and the limitations placed on his future employment with competitors of Cloeren in the event his employment with the Company was terminated, whether voluntarily or involuntarily.

## VIII.
## Termination of Employment

Plaintiff would show that Gary Oliver's employment with Cloeren was voluntarily terminated by Oliver in May, 2008. At the time of his voluntary termination, Oliver forwarded written notice to the Company notifying Plaintiff of his voluntary resignation and **confirming** that he was aware of his duty to protect and not misappropriate, directly or indirectly, Cloeren's confidential proprietary information. At that time, Oliver contacted Cloeren management, including Peter Cloeren, the President of Cloeren Incorporated, and advised that he was contemplating starting a consulting business. While such consulting business, could have potentially violated the terms and conditions of the Secrecy Agreements, including the non-solicitation and non-compete provisions contained within same (subject of course to verification as to the customers to be served by said consulting business), Cloeren expressed support for said consulting business and even offered to employ Oliver on an as needed basis, for a substantial prepayment. Plaintiff would show that this offer was declined by Oliver. Subsequent to same, Plaintiff received information, which it has now verified, that Oliver has accepted employment that is not only in violation of the terms and conditions of the Secrecy Agreements executed by Oliver, including violation of the non-compete provisions and non-disclosure provisions contained within same, but more importantly, Oliver has accepted employment with Cloeren's number one competitor in the extrusion head component of the extrusion industry, namely Defendant, Extrusion Dies Industries, LLC ("EDI").

## IX.
## Violation of Secrecy Agreement / Misappropriation of Trade Secrets

Plaintiff, Cloeren, would show that Defendant Oliver's acceptance of employment with Defendant EDI not only violates the terms and conditions of the Secrecy Agreements attached as Exhibit "A" and Exhibit "B" to Peter Cloeren's Affidavit attached hereto, but in addition to same, same violates Defendant Oliver's duties and responsibilities due and owing to his former employer Cloeren, irrespective of the execution of the subject Secrecy Agreements, to not

disclose or otherwise use against the interest of his former employer the Trade Secrets and confidential/proprietary information of said former employer (which in turn would constitute a misappropriation of same). Plaintiff would show that given the nature of the business operations of Defendant EDI, the fact that said business is in direct and continuous competition with Plaintiff Cloeren, and the position for which Defendant Oliver was retained by Defendant EDI, the disclosure by Defendant Oliver to Defendant EDI of Plaintiff Cloeren's confidential and proprietary information, including its Trade Secrets, is not only likely, but inevitable and inherit incident to said employment, thereby resulting in a misappropriation of same, whether intentional or not.

## X.
### Injunctive Relief Request

Plaintiff, Cloeren, would show that it is the owner of the heretofore referenced and defined Proprietary and Confidential Information, Cloeren Trade Secrets and the P&C Information. Plaintiff would show that Defendant, Oliver, through his employment with Cloeren, obtained access to said Proprietary and Confidential Information constituting Cloeren's Trade Secrets, which disclosure to Oliver was conditioned upon Oliver's agreement, both in writing and otherwise, to maintain said Proprietary and Confidential Information in a confidential nature, and to utilize same, directly and indirectly, inherently or otherwise, only for the business interests of Cloeren. Further, all information that Oliver has arising out of or relating to the extrusion head manufacturing business, including, but not limited to, the extrusion die business, the feed block business, and other components of the extrusion head manufacturing business, is information that was acquired through his employment with Cloeren. Further, Oliver was identified by Cloeren to Cloeren's customers as a person who could provide "trouble shooting" services related to extrusion head products and services, including, but not limited to, extrusion head components manufactured, distributed and serviced by Cloeren. Plaintiff would now show that Defendant Oliver, in conjunction with Defendant EDI, has threatened irreparable harm to

Plaintiff, including Plaintiff's property rights related to its trade marks, and other proprietary and confidential information by accepting employment with EDI in a position that clearly and unequivocally will result in disclosure, directly and indirectly, of Plaintiff's proprietary and confidential information, including its Trade Secrets. Further, Plaintiff would show that Defendant Oliver has stated specifically to other employees of Cloeren that it was his stated intention to "do anything possible to hurt the business interests" of Cloeren, which statement predated his acceptance of employment with EDI, Plaintiff's known number one competitor. Plaintiff would show that it would be impossible for Defendant Oliver to accept employment with Defendant EDI without inevitably disclosing Plaintiff's Proprietary and Confidential Information, including its Trade Secrets, which disclosure, as detailed hereinabove, would result in misappropriation of said Trade Secrets and would constitute irreparable harm to Plaintiff Cloeren of an immediate, imminent and continuing nature.

## XI.

Plaintiff would show that Defendant Oliver's conduct is completely without right or entitlement in that Oliver is aware that those certain Secrecy Agreements, attached as Exhibits "A" and "B" to Peter Cloeren's Affidavit attached hereto and incorporated herein for all purposes, contain provisions which clearly and unequivocally preclude his acceptance of employment with Defendant EDI. Further, based upon information and belief, Plaintiff would show that Defendant EDI is aware of the fact that Oliver is bound by such Secrecy Agreements which preclude EDI's employment of Oliver and in addition to same, Plaintiff would show that Defendant EDI itself requires its employees, including its employees in employment positions similar to that held by Oliver with Cloeren, to execute agreements which contain non-disclosure, non-solicitation and non-compete provisions similar to those detailed within the Cloeren Secrecy Agreements. In support of all of the foregoing, Plaintiff would refer the Court to the Affidavit of Peter Cloeren attached hereto and incorporated herein for all purposes. Plaintiff would show that the disclosure by Defendant Oliver of Cloeren's Proprietary and Confidential Information, including

its Trade Secrets, which disclosure will either be direct, indirect, or inherent to the employment with Defendant EDI constitutes a theft and/or misappropriation of Plaintiff's Trade Secrets which will result in imminent harm and irreparable injury to Plaintiff for which there is no adequate remedy at law.

## XII.

Plaintiff Cloeren would show that it has and will continue to be damaged and injured by Defendant Oliver's continued employment with Defendant EDI through loss of customers, disclosure of Proprietary and Confidential Information, including Trade Secrets, disclosure of marketing information constituting Trade Secrets, disclosure of design, manufacturing processing secrets, and other confidential information that Oliver and EDI clearly and unequivocally understand constitute Cloeren's Proprietary and Confidential Information and its Trade Secrets as that term is defined under the law. Plaintiff Cloeren has no adequate remedy of law for the injuries described hereinabove, which injuries and losses are continuing in nature and the damage associated with same is irreparable and imminent. The property and rights involved are unique and irreplaceable to the extent that it would be practically impossible, if not absolutely impossible to accurately measure, in monetary terms, the damages caused by the misconduct, theft and misappropriation by Defendant Oliver and the joinder in said acts and omissions by Defendant EDI. Further, the losses to Plaintiff Cloeren from Defendant Oliver's conduct will clearly and unequivocally exceed the financial worth of Defendant Oliver so as to prevent any adequate compensation to Plaintiff from said Defendant even if monetary damages were a sufficient remedy. As to Defendant EDI, the disclosure of said Proprietary and Confidential Information would destroy, directly and indirectly, the preeminent market position obtained by Cloeren in the extrusion head manufacturing component of the extrusion industry, which market position was obtained through substantial investment by Cloeren in both terms of time, money and other investments. The recovery of said market position, in the event of continued unauthorized disclosure and misappropriation of Plaintiff's Proprietary and

Confidential Information, including its Trade Secrets, and the irreparable harm caused by same, would subject Plaintiff and its business operation to irreparable harm from which it may never recover, irrespective of the ability, if available, to recover monetary damages.

## XIII.
### Injunctive Relief

Restating all previous allegations, Plaintiff requests that the Court, after trial, permanently enjoin the Defendant Oliver from accepting and/or continuing employment with Defendant EDI or any other perspective employer for which Defendant Oliver's employment would result in (i) a violation of the Secrecy Agreements identified hereinabove and/or which would result in inevitable and inherent disclosure of Plaintiff's Proprietary and Confidential Information, including its Trade Secrets.

## XIV.
### Imminent Harm / Temporary Restraining Order/ Temporary Injunction

In light of the foregoing, and in light of the fact that Plaintiff has ascertained that Defendant has accepted employment with Defendant EDI and in light of Defendant Oliver's stated intention to take any and all steps necessary to hurt the business interests of Cloeren, it is essential that the Court immediately and temporarily restrain Defendant Oliver and Defendant EDI from continuing their existing employment relationship, whether directly, or indirectly. It is essential that the Court act immediately to restrain Defendants, prior to (i) notice on the Defendants and/or (ii) a hearing on the matter because continued employment by Oliver with EDI will necessarily and unequivocally result in continued disclosure of Plaintiff's Confidential and Proprietary Information, including its Trade Secrets, irrespective of any stated intention by Defendant Oliver to maintain said information confidential. Further, given Defendant Oliver's stated intention to take any and all steps necessary to damage the interests of Plaintiff Cloeren, the likelihood of direct and intentional disclosure of Plaintiff's Proprietary and Confidential Information to its number on competitor, Defendant EDI, is likely, if not inherently or inevitably probable.

12

## XV.
## Temporary Injunction

In order to preserve the status quo and the rights of Cloeren to maintain its business interest in its Proprietary and Confidential Information, including its Trade Secrets, during the pendency of this action, Defendants Oliver and EDI should be cited to appear and show cause as to why said parties should not be temporarily restrained, during the pendency of this action, from continuing any existing or contemplated employment relationship, directly or indirectly, which would be in violation of (i) the Secrecy Agreements referenced more particularly hereinabove and/or (ii) the rights of Cloeren to protect from disclosure, whether direct, indirect, inherent, or inevitable its Proprietary and Confidential Information, including its Trade Secrets.

## XVI.
## Damages

Restating all previous allegations, Plaintiff would show the acts and omissions of the Defendant Oliver as well as the acts and omissions, in conjunction with Oliver, of the Defendant EDI have resulted in substantial damages being sustained to Plaintiff, of a continuing nature, which damages are in an amount far in excess of the minimum jurisdictional limits of this Court for which Plaintiff herein additionally sues.

## XVII.
## Attorney's Fees

Restating all previous allegations, Plaintiff would show that it has been caused to retain the undersigned counsel and has agreed to pay the undersigned counsel a reasonable fee. Plaintiff would show that pursuant to Texas Civil Practices and Remedies Code Section 38.001, Plaintiff is entitle to recovery for reasonable attorney's fees in an amount to be proven at the time of trial which Plaintiff herein additionally seeks.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Cloeren Incorporated, requests that:

(1)     a Temporary Restraining Order be issued without notice to Defendants, Gary Oliver and Defendant, Extrusion Dies Industries, LLC, restraining said Defendants from continuing their employment relationship, directly or indirectly, in violation of the Secrecy Agreements executed by Oliver in favor of Cloeren Incorporated and/or as would inherently and/or inevitably result in disclosure of Plaintiff's Proprietary and Confidential Information, including its Trade Secrets, as defined hereinabove;

(2)     Defendants be cited to appear and show cause as to why a Temporary Injunction should not be issued, enjoining the Defendants, Oliver and EDI, their agents, servants and employees, from directly, indirectly, continuing the employment relationship between Oliver and EDI (i) in violation of the Secrecy Agreements identified hereinabove and/or (ii) as would inherently and inevitably result in disclosure of Plaintiff's Proprietary and Confidential Information, including its Trade Secrets, as defined hereinabove;

(3)     A Permanent Injunction be ordered on the final trial of this cause enjoining the Defendants, Oliver and EDI, their agents, servants and employees, from directly, indirectly, continuing the employment relationship between Oliver and EDI (i) in violation of the Secrecy Agreements identified hereinabove and/or (ii) as would inherently and inevitably result in disclosure of Plaintiff's Proprietary and Confidential Information, including its Trade Secrets, as defined hereinabove; and

(4)     On final trial, that Plaintiff have Judgment against Defendant for damages in excess of the minimum jurisdictional limits of this Court, that Plaintiff recover pre-judgment and post judgment interest at the highest allowable rates as provided by law, costs of Court, recovery of its reasonable attorney's fees, and for such other and further relief, at law and equity, to which it may show itself justly entitled.

Respectfully submitted,

McPHERSON, MONK, HUGHES, BRADLEY,
 WIMBERLEY & STEELE, L.L.P.
3120 Central Mall Drive
Port Arthur, Texas  77642
(409) 724-6644 – Telephone
(409) 724-7585 – Facsimile


BY: _____
    JAMES E. WIMBERLEY
    State Bar No. 21750350

ATTORNEYS FOR PLAINTIFF,
CLOEREN INCORPORATED

15

STATE OF TEXAS         §
                                   §

COUNTY OF ORANGE     §

      BEFORE ME, the undersigned Notary Public, on this day personally appeared PETER CLOEREN, who being by me duly sworn on oath deposed and said that he is the authorized agent and officer for Cloeren Incorporated in the above entitled and numbered cause, that he has read the above and foregoing Plaintiff's Original Petition, Application for Temporary Restraining Order and Application for Temporary Injunction and that every statement contained therein is within his personal knowledge and is true and correct.  Further, Affiant would refer the Court to the Affidavit of Peter Cloeren attached hereto and incorporated herein for all purposes.


                                            _____

                                            PETER CLOEREN


      SWORN TO AND SUBSCRIBED BY the said Peter Cloeren on this the _____ day of May, 2008, to certify which witness my hand and seal of office.


                                            _____

                                            NOTARY PUBLIC IN AND FOR
                                            THE STATE OF TEXAS

NO. _____

| | | |
|---|---|---|
| CLOEREN INCORPORATED | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | ORANGE COUNTY, TEXAS |
| | § | |
| GARY OLIVER AND EXTRUSION DIES | § | |
| INDUSTRIES, LLC | § | _____ JUDICIAL DISTRICT |

## AFFIDAVIT OF PETER CLOEREN

BEFORE ME, the undersigned authority, on this day personally appeared Peter Cloeren, known to me to be the person whose name is subscribed hereto, being duly sworn under oath, states the following:

"My name is Peter Cloeren. I am over 18 years of age, and competent to make this Affidavit, and all matters within this Affidavit are within my personal knowledge, true and correct.

I am the President, Chief Executive Officer and Chief Technology Officer of a corporation known as Cloeren Incorporated, hereinafter referred to as the "Company" and/or "Cloeren". Cloeren is involved in the Extrusion Head manufacturing business, with Extrusion Heads manufactured by the Company being primarily utilized in the extrusion industry.

The extrusion industry includes, without limitation, products used for or in the Food, Industrial and Medical Packaging; Personal Hygiene; Aerospace; Automotive; Consumer Goods and Appliances; Housing and Construction; and Food Stuffs. The extrusion industry represents approximately 100 billion dollar annual market.

One component of the extrusion industry, representing approximately less that 0.5% if not less, of the total industry, is the Extrusion Head Industry. Extrusion Heads include by way of example, Extrusion Dies, Feedblocks, and related ancillaries and processes. This Extrusion Head industry manufactures components that are used in the extrusion industry, with the total polymer Extrusion Head industry being a market of approximately 170 million dollars annually. Extrusion Heads are components used in the extrusion manufacturing process by the various entities that manufacture products, packaging and other matters utilizing the extrusion processes. The Extrusion Heads are components utilized in the extrusion process by the various entities that manufacture products, packaging and other matters utilizing the extrusion processes. The Extrusion Heads manufactured by companies such as Cloeren are components utilized in the extrusion process that are highly technical and sophisticated. The design, manufacture, service and operation of such Extrusion Heads involve designs, processes, procedures and know-how that involve substantial and valuable proprietary interests of the various Extrusion Head manufacturing companies which manufacture said components, including Cloeren.

Cloeren is generally recognized as the leader in the Extrusion Head segment of the extrusion industry. Cloeren's headquarters and primary operational facilities are located in Orange, Orange County, Texas and its customer base (entities that purchase Extrusion heads and ancillary equipment from Cloeren) involve both domestic and foreign entities involved in the extrusion industry.

1

Cloeren's proprietary information includes patented and patent pending products and processes as well as other products, processes and procedures that are not patented for various reasons, which decision to patent or not to patent involves issues pertaining to know-how and other information that are highly confidential and proprietary trade secrets to Cloeren. Access to this and other proprietary and confidential information, including without limitation customers; customer lists; potential customers; potential projects; marketing plans; key employees and associates; manufacturing capacity, methods and specifications, key suppliers and supply specifications, and the like hereinafter referred to as the "P&C Information" has been at all times, and is currently, closely contained, controlled and monitored by Cloeren including its upper management, with access to said information limited to select management personnel and other selected persons on a "need to know" basis.   In addition to controlling access to the P&C Information, which information clearly and unequivocally constitutes trade secrets of the Company, the Company also requires that its employees, including particularly employees with access to said P&C Information, execute secrecy agreements which detail the obligations of the employees to maintain the confidentiality of said trade secret information and further obligates the employees to not utilize or otherwise disclose said trade secret information, directly or indirectly, inherently or inevitably, to any third parties who may or may not utilize the information against the interest of the Company, including, without limitation, precluding disclosure, directly or indirectly, inherently or inevitably, of said information to the Company's competitors.

Gary Oliver's relationship with the undersigned began circa 1985 as a customer of Cloeren.  Gary Oliver began his employment with Cloeren in 1990.  Prior to his employment with Cloeren, Oliver's employment background was primarily in the chemical and food packaging industry, with his previous employment being with Dow Chemical and Ball Corporation respectively.  Prior to his association with Cloeren, Gary Oliver, hereinafter referred to as "Oliver" had limited experience, expertise or training, of any kind, in the Extrusion Head manufacturing business, including, without limitation, the Extrusion Die design and manufacturing business. Oliver began his employment with Cloeren in 1990 as a direct report and confidante to the undersigned as a member of the "inner circle" of the Company, including the inner circle of the management of the Company that was involved in the development of processes, procedures and products and sale of same necessary to enhance the Company's presence in the industry, which was then beginning, in the extrusion die manufacturing segment of the Extrusion Head industry. From almost day one of his association with the Company, Oliver worked hand in hand with the upper management of Cloeren, including the undersigned, and in fact, Oliver was clearly within the "inner circle" of the Company and my executive team for approximately 17 years and as such, Oliver routinely had access to much sensitive and confidential information that was and is not known by the general public, competitors of Cloeren, and in fact was not known by most other employees of the Company, including information defined hereinabove as the P&C Information. In fact, Oliver was even involved, from time to time, in decisions regarding the patentability and/or decision to patent various products, processes and procedures as well as the decision made by the Company, on various occasions, as to whether to forego patenting processes, procedures and products for fear that the mere patenting of same would provide disclosure of certain trade secrets and information to the Company's competitors. The information to which Oliver received as a result of his employment with Cloeren involved much and/or substantially all of Cloeren's trade secrets including process secrets, know how, development technology and the thought processes of not only the Company, but also its principals and primary management team, including myself. This included not only designs, manufacturing and marketing processes and procedures that were

2

developed while Oliver was employed by the Company and in conjunction with his employment with the Company, but also involved past product design, processes and procedures, including manufacturing procedures, as well as proposed future product designs and improvements, manufacturing and processing procedures and marketing and sales policies, procedures, and practices associated with said products and services.  Such information was clearly known by Oliver to be P&C information of the Company and Oliver acknowledged the proprietary and confidential nature of same and agreed to two separate secrecy agreements with the Company, both of which are attached hereto as Exhibit "A" and Exhibit "B".  Oliver acknowledged that disclosure or utilization of this information, including the P&C Information, directly or indirectly, for interest of anybody other than the Company, would result in irreparable harm and damage to the Company including, without limitation, any use or disclosure, directly or indirectly, inherently or inevitably, of said information to the Company's competitors.

At the time of his execution of the secrecy agreements attached hereto as Exhibit "A" and Exhibit "B", Oliver was clearly aware of the implications of said secrecy agreements, as well as the corporate necessity of same to entities such as Cloeren.  In fact, based upon information and belief, Oliver had executed similar agreements and/or agreements containing similar provisions, in favor of his previous employers, including, without limitation, Dow Chemical and Ball Corporation.  Oliver had, from time to time, acknowledged to the undersigned that he was in receipt of information most every day that was clearly confidential and proprietary to the interest of the Company and he frequently acknowledged his duty and responsibility not to disclose said information, directly or indirectly, inherently or inevitably, to third parties, including, without limitation, third parties which could include competitors in the Extrusion Head manufacturing business.  In fact, upon termination of his employment with Cloeren, which employment was terminated voluntarily by Oliver, Oliver acknowledged, in writing, that he was obligated not to utilize Cloeren's P&C Information against the interest of the Company and that he was not authorized to disclose, directly or indirectly, said information to any third parties.

While he did not specifically acknowledge same, Oliver was well aware of the terms and conditions of the secrecy agreements he executed both in 1990 and in 1992, the execution of which secrecy agreements was a precondition to Oliver's receiving and/or having access to information that was clearly proprietary in nature to Cloeren, including, without limitation, the P&C Information as defined hereinabove.  But for his execution of these agreements and but for his continued acknowledgment of his obligation to maintain confidential, in all respects, the Company's proprietary information, not only would Oliver not have been authorized to continue his employment with the Company, but more importantly, he would not have been included in the "inner circle" of the management team of the Company, that included myself, and that made decisions, on a daily basis, and had access to the information, on a daily basis, that impacted not only the ongoing operations of the Company, but also the future ability of the Company to continue its position as the leader in the Extrusion Head manufacturing business as same is associated with the extrusion industry.

The agreements executed by Oliver, including the Secrecy Agreement attached hereto as Exhibit "A" and the Secrecy Agreement attached hereto as Exhibit "B" included, without limitation, non-solicitation provisions which precludes Oliver from soliciting, directly or indirectly, customers and/or prospective customers of the Company, as well as from soliciting for future employment for the benefit of others, current employees and/or representatives of the Company.  The agreements

3

also contain covenants not to compete which preclude Oliver, without the prior written consent of the Company, from directly or indirectly, inherently or inevitably, alone, as a partner, officer, director, stockholder, consultant, advisor, employee, agent or in any other individual or representative capacity on behalf of or in conjunction with any person, partnership, corporation or other entity, engage or participate in, or own an interest in any business that is in competition with Cloeren, with said competition clearly being competition in the Extrusion Head manufacturing business as same services the extrusion industry.  Further, the agreements prohibit him from engaging or participating, directly or indirectly, inherently or inevitably, in any activity which would tend to divert from Cloeren any client or business, with the clear intent of the agreement being to preclude him from accepting employment or involvement in businesses that directly compete with Cloeren's Extrusion Head manufacturing business as same services the extrusion industry.

Despite his clear knowledge of his obligations under the terms and conditions of Exhibit "A" and Exhibit "B", and despite the written representations made to the Company at the time of his termination of employment that he would not disclose, directly or indirectly, inherently or inevitably, confidential information belonging to the Company, both the undersigned and other employees and associates of the Company have received information that Oliver has accepted employment, not only in violation of the terms and conditions of Exhibit "A" and Exhibit "B", but more importantly, that Oliver has accepted employment with an entity that is in direct competition with Cloeren in the Extrusion Head manufacturing business that services the extrusion industry. In fact, the entity with whom Oliver has apparently accepted employment as Vice President of Technology with Extrusion Dies Industries, LLC, which is not only the main competitor of Cloeren in the Extrusion Head manufacturing business, but which was well known by Oliver to be in fact the number one competitor of Cloeren in said industry.  Oliver's acceptance of employment with said entity is not only a violation of his obligations under the Secrecy Agreements attached hereto as Exhibit "A" and Exhibit "B", but in addition to same, said acceptance of employment appears to be a clear intent by Oliver to comply with his stated intentions made to employees of Cloeren, and made aware to me on approximately May 22, 2008, that upon leaving the employment of the Company, it was his stated intention "to do anything he could to hurt (the interests of) Cloeren", contrary to his numerous statements to me, and others, that he "would never go to work for EDI".

It would be impossible for Oliver to accept employment with Extrusion Dies Industries, LLC ("EDI"), Cloeren's major competitor in the Extrusion Head manufacturing business, in any capacity, and still comply with his obligations under the terms and conditions of the secrecy agreements attached hereto as Exhibit "A" and Exhibit "B".  Further, it would be practically impossible, if not totally impossible, for Oliver to provide the services incident to his employment with EDI without disclosing information to EDI, directly or indirectly, inherently or inevitably, that would necessitate information of Cloeren that was proprietary and confidential in nature, including, without limitation, disclosure of the P&C Information defined hereinabove.  Disclosure of said information to any third party, including, without limitation, the Company's primary competitor in the Extrusion Head manufacturing business that services the extrusion industry, would result in immediate and continuing irreparable harm to Cloeren Incorporated for which the Company could potentially never recover.  The Company has developed processes, procedures, know-how, suppliers, customers, and other trade secrets, that are known to Oliver as a result of his employment with Cloeren, that provide Cloeren with a clear competitive advantage over its other competitors in the market, including EDI, and Oliver's acceptance of employment with said entity, in any capacity let alone Vice President of Technology, will necessarily ensure that the Company's

4

P&C Information, as defined hereinabove, will be disclosed to EDI, whether directly or indirectly, inherently or inevitably, which disclosure will clearly and unequivocally be against the interests of the Company and will result, as generally detailed hereinabove, in irreparable harm that will be both immediate and continuing in nature.

It is **NOT** the intent of the Company or the undersigned to preclude Oliver from seeking gainful employment in the extrusion industry and in fact, as detailed hereinabove, the Extrusion Head manufacturing segment of the extrusion industry represents approximately less than one-half of one percent of the extrusion industry market. As stated to me by Gary Oliver, there are innumerable employment opportunities available to Oliver, both within and without the extrusion industry, the acceptance of which would not result in violation of the non-competition provisions contained within the Secrecy Agreements attached hereto as Exhibit "A" and Exhibit "B", and would arguably not result in violation of the non-disclosure and non-solicitation obligations also detailed within said agreements. There are innumerable employment opportunities available to Oliver which would allow him to take advantage of the substantial experience and expertise that he obtained incident to his employment with Cloeren while still not violating his duties and responsibilities due and owing to the Company associated with protection of the Company's confidential and proprietary information, including its trade secret information, while also not violating his covenant not to compete contained within the agreements attached hereto as Exhibit "A" and Exhibit "B". It appears, however, that Oliver has specifically elected to accept employment with a company, including particularly EDI, with the express purpose of damaging, directly or indirectly, the interests of Cloeren, both economic and otherwise."

Further, Affiant sayeth not.

PETER CLOEREN, PRESIDENT,
CHIEF EXECUTIVE OFFICER AND CHIEF
TECHNOLOGY OFFICER OF CLOEREN
INCORPORATED

SUBSCRIBED AND SWORN TO BEFORE ME by the said Peter Cloeren on this the 24 day of May_____, 2008, to certify which witness my hand and seal of office.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS



NACOLE BARRON
My Commission Expires
March 26, 2010

5

Rev. 8-14-89                                                    EXHIBIT A

SECRECY AGREEMENT

In consideration of my employment by P.C.E. Corp. d/b/a
The Cloeren Company, or any subsidiary or affiliate thereof,
(hereinafter jointly referred to as "Company") and any future
employment by the Company and monies to be paid me, the receipt,
sufficiency and adequacy of which is hereby acknowledged, I
agree:

1. During my employment with the Company: (a) I will
devote my full working time and best efforts to the interest of
the Company; and (b) I will not participate in any planning,
operation, or management of any activity competitive with the
Company's interest and will not otherwise engage in any activity
in conflict with the interest of the Company except as authorized
in writing by an officer of the Company.

2. At the Company's expense, I will at any time during
or after my employment promptly disclose to the Company all ideas,
inventions and discoveries (regardless of patentability) which
pertain to the business interest of the Company and/or which are
conceived, made or learned by me along or jointly with others
during the term of my employment or as a result of any tasks
assigned to me by the Company.

3. I will at the Company's expense cooperate in all
lawful acts which may be necessary or desirable in the judgment
of the company to protect for the Company or its nominee all such
ideas, inventions and discoveries including applying for,
obtaining, maintaining and enforcing patents thereon in all the
countries of the world and including execution of papers and
giving my testimony appropriate thereto.

4. During my employment I may develop or be exposed to
confidential information and trade secrets of Company for its
licensors or customers, and maintenance of the proprietary
character of such information to the full extent feasible is
important to the Company. Such confidential information and
trade secrets may include, but not be limited to, formulas, pat-
terns, devices, secret inventions, patents, patent applications,
processes, customer lists, cost/profit structures, and com-
pilations thereof. Accordingly, for so long as any such con-
fidential information and trade secrets may remain confidential,
secret or otherwise wholly or partially protectable either during
or after my employment, I will not use or divulge such infor-
mation except as permitted or required by the duties of my
Company employment. Specifically though, without limitations on
the foregoing for the period lawfully consistent with the time,
place and circumstance, I will not undertake any employment com-
petitive with or in conflict with the interest of the Company
wherein the complete unhampered fulfillment of the duties of that
employment will inherently or inevitably fall upon me to reveal,
to base judgments upon or to use any such confidential infor--
mation or trade secrets.

_____        _____
Initial                Date

Rev. 8-14-89                                    EXHIBIT A

5. I will return to the Company, upon termination of my employment, all models, drawings, photographs, writings, documents, files and other papers and things produced by me or coming into my possession by or through my employment. I will retain no copies of any such material considered confidential by the Company, or bearing any Company logo.

6. I hereby covenant and agree that upon termination of my employment, I will neither directly nor indirectly, within the existing marketing area of the Company whether within or without the United States, or any future marketing area of the Corporation begun during my employment, enter into or engage generally in direct competition with the Company in the lines of business in which the Company presently engages or in which it may become engaged during the term of my employment, either as an individual on my own or as a partner or joint venturer, or as an employee or agent for any person, or as an officer, director, or shareholder of a corporation, or otherwise, for a period of three (3) years after the date of termination of my employment hereunder; provided, however that I may buy, sell, or otherwise deal in publicity traded securities of companies which would otherwise be subject to the prohibition of this paragraph.

7. Both during and for three (3) years after my employment, I will not directly or indirectly, or by aid to others, do anything which would tend to divert from the Company any trade or business (a) with any customer with whom I had any contact or association during one year next preceding termination of my Company employment or (b) with any party whose identity or potential as a customer was confidential and learned by me at any time during my employment.

8. During my employment and for three (3) years after termination of my employment, I will not either directly or indirectly induce or attempt to induce any person with whom I was acquainted while in the employ of the Company, to leave the employment of such Company.

9. I further covenant and agree that if any court of competent jurisdiction ever holds that the period of time and/or geographic area of the covenants contained herein are too broad to be enforced, said court will not disregard the provisions herein but will, instead, enforce those provisions as to such period of time and/or geographic area as the court deems equitable.

                                        8/2/90
                        Initial          Date

-2-

Rev. 8-14-89                                    EXHIBIT A

    10. I acknowledge that my breach of any of the covenants set forth in this Agreement will result in immediate and irreparable injury to the Company, for which the Company will have no adequate remedy at law. I agree that, in the event of my breach or threatened breach of any covenant of this Agreement, the Company will be entitled to a temporary restraining order and temporary injunction and permanent injunction restraining me from future violations of this Agreement. Nothing herein will be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages from me. I also agree to pay all costs incurred by the Company in obtaining an injunction, including reasonable attorneys' fees. I stipulate that this Agreement will be governed by Texas law, and that venue for any action brought against me by the Company to enforce its rights under this Agreement will lie in Orange County, Texas.

Dated: *August 2, 1990*

_____
Employee

-3-

**EXHIBIT B**

### SECRECY AGREEMENT

In consideration of my employment by The Cloeren Company, or any subsidiary or affiliate thereof, (hereinafter jointly referred to as "Company") and any future employment by the Company and monies to be paid me, the receipt, sufficiency and adequacy of which is hereby acknowledged, I agree:

1. During my employment with the Company: (a) I will devote my full working time and best efforts to the interest of the Company; and (b) I will not participate in any planning, operation, or management of any activity competitive with the Company's interest and will not otherwise engage in any activity in conflict with the interest of the Company except as authorized in writing by an officer of the Company.

2. At the Company's expense, I will at any time during or after my employment promptly disclose to the Company all ideas, inventions and discoveries (regardless of patentability) which pertain to the business interest of the Company and/or which are conceived, made or learned by me alone or jointly with others during the term of my employment or as a result of any tasks assigned to me by the Company.

3. I will at the Company's expense cooperate in all lawful acts which may be necessary or desirable in the judgement of the Company to protect for the Company or its nominee all such ideas, inventions and discoveries including applying for, obtaining, maintaining and enforcing patents thereon in all the countries of the world and including execution of papers and giving my testimony appropriate thereto.

Initials _____

**EXHIBIT B**

4. During my employment I may develop or be exposed to confidential information and trade secrets of Company for its licensors or customers, and maintenance of the proprietary character of such information to the full extent feasible is important to the Company. Accordingly, for so long as any such confidential information and trade secrets may remain confidential, secret or otherwise wholly or partially protectable either during or after my employment, I will not use or divulge such information except as permitted or required by the duties of my Company employment. Specifically though, without limitation on the foregoing for the period lawfully consistent with the time, place and circumstance, I will not undertake any employment competitive with or in conflict with the interest of the Company wherein the complete unhampered fulfillment of the duties of that employment when inherently or inevitably fall upon me to reveal, to base judgments upon or to use any such confidential information or trade secrets.

5. I will return to the Company upon termination of my employment, all models, drawings, photographs, writings and other papers and things produced by me or coming into my possession by or through my employment. I will retain no copies of any such materials considered confidential by the Company, or bearing any Company logo.

6. Both during and for three years after my employment, I will not directly or indirectly, or by aid to others, do anything which would tend to divert from the Company any trade or business (a) with any customer with whom I had any contact or association during one year next preceding termination of my Company employment or (b) with any party whose identity or potential as a customer was confidential and learned by me at any time during my employment.

Initials

# EXHIBIT B

7. During my employment and for so long up to two years after termination of my employment as may be lawfully consistent with the time, place, and circumstance, I will not either directly or indirectly induce or attempt to induce any person with whom I was acquainted while in the employ of the Company, to leave the employment of such Company.

8. The undertakings herein shall not be construed as any limitation upon the remedies the Company might have a law or in equity in the absence of this agreement.

9. I am aware of no legal obligations inconsistent with the terms of this agreement or with my undertaking my employment with the present Company.

DATED this 2 day of Sep , 19 92

PLACE OF EXECUTION

Orange, Texas