UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

CLOEREN INCORPORATED,

                          Plaintiff,                    Case No. 09-215

v.

COMPUTER FORENSIC SERVICES, INC.

                          Defendant.

---

## AFFIDAVIT OF MARK LANTERMAN IN SUPPORT OF OBJECTION TO THE COURT'S EXERCISE OF PERSONAL JURISDICTION

---

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF HENNEPIN    )

MARK LANTERMAN, being first duly sworn deposes and says:

1.      I am the Chief Technical Officer ("CTO") of Computer Forensic Services, Inc. ("CFS"). I submit this Affidavit as an authorized corporate officer of Computer Forensic Services, the named defendant in the above-captioned case. I submit this Affidavit in support of CFS's opposition to this Court's personal jurisdiction over CFS.

2.      I am the person responsible at CFS for communications with Fredrikson & Byron LLP, the law firm that retained CFS to perform work relating to Extrusion Dies Industries, LLC and Gary Oliver.

3.      All of my communications relating to retention of CFS, its services, and lack of any payment to date, was done with Fredrikson & Byron. I do not recall any communications

1

with employees of Cloeren, Inc. As the Engagement Agreement clearly says, the contractual relationship is, was and always has been between CFS and Fredrikson & Byron. I have attached a true and correct copy of the Engagement Agreement to this Affidavit as **Exhibit 1**.

4.      I have attached a true and correct copy of the affidavit containing my sworn testimony in the Minnesota state court action as **Exhibit 2** to this Affidavit. To the extent necessary, I incorporate my testimony in that sworn affidavit into this Affidavit as if fully set forth herein, and I swear that my testimony is true and correct to the best of my knowledge and recollection. I also enclose a true and correct copy of the memorandum of law that was served and filed by CFS in the Minnesota state court action as **Exhibit 3** to this Affidavit.

5.      All of my contacts with Fredrikson & Byron took place in Minnesota. CFS's offices are located in Minnetonka, Minnesota, and the offices of the Fredrikson & Byron attorneys that I communicated with are in Minneapolis, Minnesota. The deliveries of physical items all took place at CFS offices in Minnetonka, Minnesota. The forensic analysis performed by CFS took place in Minnetonka, Minnesota.

6.      No one at Fredrikson & Byron told me, or anyone at CFS to my knowledge, that a protective order was in place in the Wisconsin federal court proceeding until after we sent the notice of sale. We were first provided a copy on or about March 11, 2009. Fredrikson & Byron did not show me any protective order before that, nor did it have me sign any document in which I personally, or on behalf of CFS, agreed to be bound by it. I did not sign the "Written Assurance," and to my knowledge, no one at CFS with authority to do so has signed it. I have never been shown a putative signed copy on behalf of anyone at CFS. I had no knowledge of the protective order until my attorney John F. Bonner informed me in March, 2009, that there was a

2

claim that a protective order applied to the information.  The Engagement Letter with Fredrikson & Byron required the Firm to inform me immediately of any applicable court order or stipulation regarding the data.

7.      CFS does not maintain an office in Wisconsin, and it does not have a registered agent in Wisconsin.  I, on behalf of CFS, do not voluntarily consent to the Wisconsin federal court's jurisdiction over CFS in the lawsuit brought by Cloeren, Inc., or the underlying litigation involving Cloeren, Inc.

Mark Lanterman

Subscribed and sworn to before me
this _13th_ day of _April_

Notary Public

SUSAN Y. BOSCH
Notary Public-Minnesota
My Commission Expires Jan 31, 2010



**ComputerForensic Services**

### Engagement Agreement

Computer Forensic Services, Inc. ("CFS") agrees to be retained by Fredrikson & Byron to provide forensic services. The services provided may include computer forensic consulting, collection and preservation of electronically stored information ("ESI"), forensic analysis and processing of ESI, written and live expert testimony, and other services to be determined by the parties. The prices, terms and conditions offered in this agreement are revoked if this agreement is not executed and returned by Fredrikson & Byron to CFS within fourteen (14) days of its offering.

1.  CFS Engagement:

    a)  <u>CFS agrees to provide services only after completion of two events: 1) return of the executed agreement by Fredrikson & Byron to CFS, and 2) payment by Fredrikson & Byron to CFS of a refundable retainer fee in the amount of $5,000.00.   Engagement occurs upon completion of both events after which CFS will undertake performance of Fredrikson & Byron's project.</u>

    b)  <u>Fredrikson & Byron's project is subject to a minimum project fee of $3,000.00. Upon the conclusion of Fredrikson & Byron's project if the total amount invoiced does not exceed $3,000.00 Fredrikson & Byron agrees to pay CFS the difference between the amount invoiced and the minimum project fee.</u>

    c)  Fredrikson & Byron will be invoiced for the minimum project fee sixty (60) days after engagement if no work on the project is assigned. If a retainer amount is present Fredrikson & Byron agree that the minimum project fee may be withdrawn from the retainer total. The retainer must be replenished before CFS will undertake further assigned work on Fredrikson & Byron's project.

    d)  Fredrikson & Byron agree to promptly notify CFS upon completion of the engagement. CFS agrees to promptly reimburse Fredrikson & Byron any remaining sum of the retainer fee, return all devices in the custody of CFS, and destroy all client data in the custody of CFS, once Fredrikson & Byron has paid any and all outstanding invoices in full, or has made sufficient arrangements to pay in full.

EXHIBIT 1

2.      CFS Services:

CFS will perform the following services, without limitation, and will charge Fredrikson & Byron accordingly.

    a.      Imaging Services:

The charge for Imaging Services includes the creation of a forensically sound bit-stream image, image verification, image encryption and a deliverable of the encrypted images on DVD media.

    i.      All Hard Drive Imaging will be billed at the following flat rates per hard drive:

    1.      0-200 Gigabytes $750.00;
    2.      201+ Gigabytes will be priced on a case-by-case basis.

    ii.      All Server Imaging will be billed at the following flat rates per server size:

    1.      0-500 Gigabytes $1,000.00;
    2.      501+ Gigabytes will be priced on a case-by-case basis.

    iii.      All imaging not occurring at CFS' place of business at 601 Carlson Parkway, Suite 630 in Minnetonka, MN will be subject to a per trip Onsite-Imaging Fee:

    1.      Per Trip Onsite Imaging:  $2,000.00;

    2.      Onsite Imaging Hourly Rate:  Fredrikson & Byron will be assessed the appropriate hourly rate per consultant for the duration of the imaging.  The hourly rate is determined by subparagraphs (b) and (c) below.

    b.      Work performed by CFS will be billed on an hourly basis.  This includes but is not limited to consulting services, analysis, data recovery, processing and other tasks required to complete the assignment for Fredrikson & Byron.  Services will be billed at the applicable hourly rate for the consultant performing the work at the time the services are provided.  The current hourly rate for these services is $275.00 per hour for work performed during weekday business hours (Monday-Friday from 8:00 a.m. to 5:00 p.m.).  The default rate and time period for all of CFS' work on this project are CFS' regular business rate and regular business hours, as defined herein.

2

c.   Priority and after-hours work performed by CFS will be billed at $412.50 per hour for work performed on weekdays outside business hours, weekends, and holidays. CFS reserve the right to charge priority work rates when a client requests expedited performance of their project during CFS' regular business hours. "Expedited" is defined as, without limitation, any request for work that does or could require another project or regular business practice to be delayed or set aside in order to complete the request.   All work performed at CFS' priority work rate will be agreed upon by the parties prior to CFS beginning the work.

d.   All expert witness testimony requested in this project will be made in any or all of the following forms: report, affidavit, deposition, or as live witness for proceedings before any court, or any alternative board or panel.  The hourly rate for the preparation and performance of expert witness testimony is $412.50 per hour.  An eight (8) hour minimum expert witness fee will be assessed for both preparation and performance.  CFS requires twenty-four (24) hour notice of cancellation for all reservations for testimony. Fredrikson & Byron will be invoiced the minimum fee for testimony and preparation regardless of actual time spent, if any, rendering testimony, unless the reservation is cancelled within the twenty-four (24) hour term.

3.   Project Invoicing:

a.   CFS shall submit a monthly invoice to Fredrikson & Byron regarding any and all services performed or costs incurred on the project during the covered period. Fredrikson & Byron agree to payment of the invoice amount within thirty (30) days of the invoice date.  Invoices not paid by the due date are subject to a late fee of 1.5% of the amount of the invoice per month for each month the invoice remains unpaid.

b.   CFS reserves the right to cease work on the project or any other project for which we are providing services to Fredrikson & Byron if its invoices remain unpaid for a period in excess of forty-five (45) days.  CFS reserves the right to withdraw from this engagement if its invoices remain unpaid for a period exceeding ninety (90) days.  CFS reserves the right to declare as abandoned any and all data and devices our clients' have placed in our custody if a client's invoices remain unpaid for a period exceeding ninety (90) days.

c.   Fredrikson & Byron agree to notify CFS in writing of any and all disputes regarding an invoice within 15 days of the date of the billing of the disputed invoice.  Fredrikson & Byron agree that CFS' billing records are the default record establishing any and all payment terms for an invoice.  Fredrikson & Byron agree that if no disputative writing is received by CFS within the 15 day period then all amounts under an invoice are due and owed to CFS.

d. Fredrikson & Byron agree CFS may advance reasonable and necessary out-of-pocket expenses required for the completion of the project. Fredrikson & Byron agree to pay all such reasonable and necessary out-of-pocket expense incurred by CFS to complete the project. "Expenses" are defined as, without limitation, equipment and media for deliverables and/or storage; automobile mileage and necessary fuel; air, automobile, rail, or sea travel costs including tickets and/or rental; travel time; long distance telephone charges; copying charges; hotel or any necessary off-site accommodations; shipping charges and insurance.

e. All project cost estimates and quotes furnished by CFS to Fredrikson & Byron at their request or otherwise are subject to change without notification. Fredrikson & Byron acknowledge that the nature of the work performed by CFS is complex and time consuming and that any cost estimate or quote furnished by CFS is not a cap on the amount Fredrikson & Byron may be charged for the project. CFS agrees to notify Fredrikson & Byron within a reasonable time period after discovery of the need to exceed any furnished cost estimate or quote. CFS agrees to halt work on a project upon discovery that work already performed has exceeded a furnished cost estimate or quote. CFS will obtain approval from Fredrikson & Byron prior to continuing work on the project if current work exceeds the furnished cost estimate or quote.

4. Data Storage:

a. Fredrikson & Byron agree to be billed a monthly rate for the storage on our secure servers of the entire project data volume beginning one full month after engagement; for example, if engagement begins on December 10, 2007, then CFS would begin billing storage charges on February 1, 2008. CFS reserves the right to invoice Fredrikson & Byron for the storage of all project data if Fredrikson & Byron fail to provide analysis instructions within fourteen (14) days of CFS receiving the data. Data storage rates are as follows:

   i. Project data volumes under 1 gigabyte (GB), defined as 1,001 megabytes (MB) are subject to a flat $30.00 per month charge;

   ii. Project data volumes equal to and greater than 1 GB are subject to be charged $2.50 per gigabyte per month.

   In no event will monthly data storage be billed less than $30.00 per month.

4

b.  <u>Fredrikson & Byron agree to advise CFS when they believe all analysis has been completed for their project. Fredrikson & Byron agree to be billed one month of data storage for any and each device that Fredrikson & Byron decide to abandon in the custody of CFS. Fredrikson & Byron agree to be billed according to the terms and conditions of this agreement for all data stored on our secure servers at the conclusion of the project that Fredrikson & Byron elect to maintain in our custody in the case of possible future work.</u>

c.  <u>CFS reserves the right to remove any and all client data from our secure servers after sixty (60) days if no analysis is ever instructed or performed.</u> The default time period, once analysis has been performed, for storing our clients' data on our secure servers is ninety (90) days. Paragraph 3, above, sets out the terms and conditions for the abandonment and destruction of data and devices. <u>Fredrikson & Byron agree to pay all storage costs accrued prior to CFS declaring the abandonment of data and devices in our custody. Fredrikson & Byron agree to pay CFS' regular hourly rate for the time required to remove the data from our secure system.</u>

   i.  CFS reserves the right to retain abandoned data removed from our secure servers on encrypted storage media. Any such retained data may be restored to our secure servers if all outstanding invoices are brought current, and a new non-refundable retainer not less than $5,000.00 is furnished to CFS. CFS will restore any and all such data at our regular hourly rate for the time period required to load the data. All work after completion of data restoration will be subject to the terms and condition of this agreement.

5.  Fredrikson & Byron warrants it has the authority to submit the data, materials, equipment, or information it is providing to CFS to provide computer forensic services. Fredrikson & Byron agree that it will hold harmless and indemnify CFS for any damages or claims arising out of the services performed on this project, except if damages or claims have arisen through the negligence of CFS.

6.  CFS agrees to maintain the confidentiality of all project information Fredrikson & Byron entrust to the custody of CFS. CFS agrees to not disclose any confidential information obtained during the course of providing services for Fredrikson & Byron to any third party, except as may be required by law or court order. Fredrikson & Byron agree to immediately provide CFS with any relevant order or stipulation regarding the handling of any confidential information.

7.  CFS agrees to exercise necessary care to secure and protect from damage or destruction the data, materials, equipment, or information provided by Fredrikson & Byron. Fredrikson & Byron agree to hold harmless and indemnify CFS for any claim made

against CFS for damage or destruction to the data, materials, equipment, or information provided by Fredrikson & Byron.

8. The parties agree that this engagement agreement is a contract and that the laws of the State of Minnesota will govern the interpretation, construction and enforcement of this document without regard to Minnesota's choice of law rules. The parties also agree that any dispute regarding this agreement shall be venued in Hennepin County District Court, State of Minnesota.

9. The parties agree to abide by the prices, terms and conditions set out in this agreement. Any and all parties that fail to abide by the prices, terms and conditions of this agreement, agree to pay all costs of collection and attorney's fees incurred by the compliant party or parties regarding that failure, regardless of whether a suit is filed, and including any post-judgment fees and costs.

10. This document contains the entire engagement agreement between Fredrikson & Byron and CFS. This agreement can only be modified in writing.

6

Please acknowledge by signature in the space provided below that the foregoing accurately sets forth the prices, terms and conditions, of our agreement. The signatory must also possess sufficient authority to represent and bind Fredrikson & Byron. Please return the original to CFS within fourteen (14) days of its offering to preserve the agreement and engagement of CFS.

Thank you for the opportunity to work with you. We appreciate your business. If you have any questions concerning this agreement or any other matter concerning our services, please don't hesitate to let us know.

Sincerely yours,

Mark Lanterman
Chief Technology Officer

I hereby agree and accept on behalf of Fredrikson & Byron the prices, terms and conditions, as set forth above in the engagement agreement.

By: _____

Date: _____8-26-08_____

7

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

---

Extrusion Dies Industries LLC, Gary Oliver,          Court File No. 27-CV-09-6284

          Plaintiffs,

   vs.                                          **AFFIDAVIT OF MARK LANTERMAN**
                                                     **SUBMITTED IN OPPOSITION TO**
Computer Forensic Services, Inc.,                    **MOTION FOR INJUNCTIVE RELIEF**

          Defendant.

---

STATE OF MINNESOTA   )
                   ) ss.
COUNTY OF HENNEPIN   )

    MARK LANTERMAN, being first duly sworn deposes and says:

    1.    I am the Chief Technical Officer ("CTO") of Computer Forensic Services, Inc.

("CFS"). I submit this Affidavit as an authorized corporate officer of Computer Forensic

Services, the named defendant in the above-captioned case.

    2.    I am the person responsible at CFS for communications with Fredrikson & Byron

LLP, the law firm that retained CFS to perform work relating to Extrusion Dies Industries, LLC

and Gary Oliver. I founded CFS. I am a computer forensic analyst and have been in this line of

work since 1991. I have an undergraduate and master's degree in computer science and worked

in law enforcement for 11 years prior to entering the private sector in early 2003. My law

enforcement work included a three-and-one-half year assignment to the United States Secret

Service Electronic Crimes Task Force.

1

**EXHIBIT 2**

3.      All of my communications relating to retention of CFS, its services, and lack of

any payment to date, was done with Fredrikson & Byron.  I do not recall any communications

with Extrusion Dies or Oliver.  As the Engagement Agreement clearly says, the contractual

relationship is, was and always has been between CFS and Fredrikson & Byron.  The

Engagement Agreement is attached to attorney Christopher Stafford's March 26, 2009 affidavit

as Exhibit B.  Stafford admits that CFS and Fredrikson & Byron are the contracting parties.  CFS

has performed computer forensic work on multiple cases for Fredrikson & Byron over the years,

just as in this matter, although Fredrikson & Byron never refused and failed to pay in the past.

4.      In late June or early July, 2008, Christopher Stafford, the Fredrikson & Byron

attorney, contacted me by telephone.  Stafford asked me to perform expert computer forensic

work for his firm.  Stafford said he wanted me to collect information from certain computers,

approximately six devices.  Further, Stafford explicitly told me that he wanted me to recover

deleted data from those computers.   Stafford asked that we search the computer devices to

determine if Gary Oliver had taken certain computer data; if he had accessed the computer server

after he had left the employ of his company, and if computer data had been deleted by Mr. Oliver

thereby creating a claim of spoliation.

5.      When performing work for Fredrikson & Byron under the contract, I and the other

CFS computer analysts followed a consistent procedure.  We gain actual physical access to a

computer or storage device, which may include hard drives, CDs, data DVDS, memory sticks,

hand-held devices, servers, and similar materials.  We then create an evidentiary copy of the

storage device, sector by sector.  It is a perfect copy of exactly what is found on the device and

includes everything stored in it.  That evidentiary copy is referred to as the forensic image.

6.     After we create the forensic image, we then validate it to make sure that it is, in fact, identical to the information on the original device.

7.     Next, we encrypt this forensic image with our proprietary software so that we can control who gets access to which forensic images internally, as well as to ensure that outside entities cannot obtain access to unencrypted data on our servers or storage devices.

8.     At this point, we can then work with the forensic image per the understanding with our client.  One common task is to conduct searches within the images to find information relevant to the client.  Another task, again which we performed for Fredrikson & Byron, is to restore and recover "deleted" information, particularly but not limited to, e-mails or documents. The restoration and recovery process is the epitome of a forensic analyst's task.  As I explained, the forensic image is a perfect copy of the information, sector by sector, on the storage device.  It can include "deleted" information, such as e-mails, spreadsheets, word processing documents, and the like.  In layman's terms, when a user hits the delete button for a file, the storage device does not normally fully extinguish and erase the actual data; instead, the computer destroys the computer's ability to "find" and read the file.  Over a lengthy period of time, the computer can then store new information in each of the sectors containing deleted information.  The delete function essentially releases the sectors containing the file so future storage can take place in those sectors.  This is somewhat like having a puzzle made up of millions of pieces, but without having the puzzle's picture.  The computer cannot piece together the puzzle parts.  There is a further complication: the "file" itself is in a highly fragmented, unindexed state on the storage device.  Hence, there is not one location where all of the puzzle parts are collected, but instead the parts are mixed in with the pieces from countless other, unrelated puzzles.  The  forensic

3

expert must locate each bit of information, piece it together, and recreate the full file, and do so file by file.

9.      Stafford told me that Fredrikson & Byron needed us to work quickly. Fredrikson & Byron began delivering hardware to CFS beginning on or about July 2, 2008. We initially created forensic images and returned the hardware. We did not do any further analysis or forensic work at that time, awaiting instructions regarding search term parameters for the information collected. According to my records, we received the devices upon which we would perform and bill for forensic services periodically through August 19, 2008.

10.     After August 19, Fredrikson & Byron provided us with search terms and parameters. I then reviewed the data that was created by us in the forensic images, compared it to the search parameters, and took into account the request to restore data. I then called Stafford and explained to him that the recovery of deleted information would be time consuming and expensive because it requires active work and analysis by the computer experts to find the information, piece it together, and recreate the so-called deleted material in a new, readable format. I told him that, based upon the number of forensic images to be restored and then searched, the fees could total as much as $100,000. Stafford's exact words in response were: "I guess that's just the nature of the beast. Sounds good. Let me know when it's done." I took that to be an acceptance of the quote. I then sent the Engagement Agreement to Fredrikson & Byron, and it was returned signed and executed with a date of August 26, 2009.

11.     CFS then began the analysis, restoration, and searches using the process described above. We completed most, if not all, of the forensic work for which we billed Fredrikson & Byron by September 12, 2008. CFS then sent the bill for services to David P. Bunde at

4

Fredrikson & Byron dated September 30, 2008. I was told by Stafford to address the bill to Bunde on behalf of Fredrikson & Byron. The bill totals $86,915.57. It is about $13,000 less than the estimate I gave to Stafford.

12.    Fredrikson & Byron then refused to pay the bill. Bunde sent me a curt letter saying that he thought the bill was a mistake. I contacted Stafford directly, the contact attorney that I had dealt with, and told him about Bunde's letter. I told Stafford that I did not understand why Bunde thought it was a mistake since I gave Stafford a cost estimate of $100,000. Stafford was apologetic to me. He told me that he did not remember the specific dollar amount I gave him, but he admitted that he remembered me telling him it would be "expensive." Stafford told me that he would take care of it with Bunde. About one week later, I heard from Bunde again, and he continued to refuse payment. I then called Stafford a number of times, leaving voice messages. He did not return my calls. At no time did Stafford ever say that the bill was unexpectedly high or that it did not contain sufficient detail. Fredrikson & Byron still has failed to pay one penny of the bill to date.

13.    I have read the Fredrikson & Byron attorneys' affidavits and legal brief. I do not know why Fredrikson & Byron is not a party since it hired CFS, signed the contract in CFS and the law firm's name, handled all communications with me, delivered all devices to me, and dealt with me when refusing to pay. CFS sent all bills for payment to Fredrikson & Byron. I, on behalf of CFS, work with many law firms and other entities, and I know what it is to be hired as an expert. While I am not a lawyer, it has been my understanding that Fredrikson & Byron retained CFS to be its computer forensic experts, and they had treated me as such. I worked with Fredrikson & Byron on that basis because it is a local law firm that I have dealt with in the past.

5

I did not contract with an out-of-state entity that is not even mentioned in the Engagement Agreement.

14.     Fredrikson & Byron, while using the current plaintiffs as parties for its refusal to honor its own Engagement Agreement with CFS, argues that CFS does not want to resolve the non-payment and instead rushed to exercise our lien rights. That is absolutely false. The Fredrikson & Byron materials fail to inform this Court of extensive efforts on our part to resolve this matter prior to foreclosing on our lien, most significantly my contacts with attorney Stafford that I explained above.

15.     After my efforts with Stafford went nowhere on his end, I asked my legal counsel Jeff Bonner at Bonner & Borhart LLP to contact David Bunde and try to obtain payment. Bonner arranged a meeting with Bunde on or about November 21, 2008 that I attended. Bunde had other lawyers present, as well as a computer technician from his Firm's IT department. Noticeably absent from the meeting was Chris Stafford, who knew about the cost estimate and with whom I had my initial conversations about payment. This meeting was lengthy and detailed. I went over each part of the bill, describing in detail what we did and how the cost amounts were reached. Regarding my conversation with Stafford, of which Bunde had no part, Bunde says that he spoke with Stafford and Stafford claimed to recall me telling him that the work would be "expensive," but he "did not recall" me specifically telling him the $100,000 estimate.

16.     The legal brief argues that I refused to provide "time records" for the work that CFS "allegedly" did. (April 6, 2009 brief, at 3-4). It is illuminating that no attorney from Fredrikson & Byron makes that allegation under oath in any affidavit. It is false. During the November 21 meeting, Bunde asked for detailed records that described all of the work done by

CFS analysts. I explained to him that we do not internally maintain detailed time entries for each step taken by an analyst, as a lawyer might do. Instead, I told him that time records track only the cumulative amount of time spent analyzing the images (hard drive copies). I explained to him that it would take a great amount of time to detail every email found, document searched for, and the like, and as a result, we do not do timekeeping like an attorney does. Detailed time entry of that magnitude would take as much time as the forensic work itself. I do not believe many, if any, forensic experts maintain billing records in that level of detail. I told Bunde that we could show analysts' amount of time on each device, but that we did not believe it would be of much practical use if he was trying to assess each minute of an analyst's duties. To my knowledge, Bunde did not raise that issue again until after we gave notice of the lien sale.

17.     After the November 21 meeting, Bonner on my behalf had another meeting with Bunde to resolve the matter in early December. Bonner informed me that Bunde wanted CFS to produce a bill for approximately one-half the total amount owed. Bonner told me that Bunde intended to send this initial bill to his client, obtain the proceeds, and provide it to CFS. Then, CFS would bill for the other one-half, Bunde would get it paid by the client, and then Bunde would pay CFS. I directed my billing manager to produce a bill that cut off the work performed at approximately the one-half charge amount. The billing department produced that bill as Bunde requested, and we sent it to Fredrikson & Byron for payment. Shortly thereafter, the billing manager received a call from Extrusion Dies' CFO who asked what the bill was for. He was told that it was for computer forensic work we did for Fredrikson & Byron in the Extrusion Dies litigation. The CFO then asked if additional billing would be coming, and he was told that additional monies were owed. We received no payment after following Bunde's request to split

7

the payments.

18.     My attorney Bonner has kept me informed of his efforts to continue working with Bunde to get payment.   I know he is submitting an affidavit containing his contacts, letters, and the like.  It has become clear that Fredrikson & Byron will not pay the amount due, but instead wants CFS to drastically reduce its bill because the Firm views it as being too high.  However, we performed all of the work for which we seek payment.  I discussed the magnitude of the work and gave a cost estimate to Stafford before we did the restoration and analysis.  Mindful of the urgency, we began work immediately, even before the Engagement Agreement was signed.  We have a long history of working with the Fredrikson & Byron firm on large and small computer forensic projects.  We performed the forensic work as quickly as quality permitted, and we did a first-rate job.  When Bunde complained about the bill, we tried to work with him; we took a great deal of time to meet with him, and we cooperated in his proposal to get the matter resolved by payment of the full bill in two segments.  Now, Fredrikson & Byron is casting aspersions against our work (saying in their brief that we "allegedly" did the work, for example), and it is attempting to not be a party in this lawsuit brought against us based on a contract it signed for expert services.  Under these circumstances, we cannot simply cut our prices drastically or agree to an mediation process where we have yet to be told the basis for the claim that the bill is "too high."

19.     I have reviewed the attorney's memorandum for a preliminary injunction dated April 6, 2009, particularly the argument relating to the lien that CFS has under Minnesota Statutes Sections 514.18 through 514.22.  The lawyer's argument shows, at best, a fundamental lack of knowledge or understanding concerning the computer forensic work that we perform.

8

The lawyers' papers argue that we merely hold on to materials provided to us, and that we do not create, add value, or expend labor upon it.  The papers claim we are nothing more than the ghostwriter who merely holds on to a scrap book given to him by the subject of an "autobiography" as in the case they cite.   First, from the device the client provides, we create the forensic image.  We expend labor and skill upon the hardware to create the new forensic image. Creation of that forensic image is new value on our part, and that is what is held by us.  We compile deleted data fragments from the image we create.  Second, we encrypt the forensic image in our proprietary software.  Again, we are expending labor and skill when we use our encryption software, and it adds value because it safeguards the data.  Third, as explained regarding the restoration analysis, we actively work in the sectors to piece together into a usable format from the deleted data fragments documents that otherwise are no longer accessible or visible by the computer user (such as Word documents, emails, internet usage history, chat conversations, and spreadsheets).  We then compile those restored documents in a new format. Again, this is a creation on our part, we are expending labor and skill, and it certainly adds value to the raw data initially forwarded to us.  It is one of the critical reasons that law firms such as Fredrikson & Byron hire us as their experts.  These materials are the items that are described in the notice of sale.

20.     None of Stafford, Bunde, or any other attorney at their Firm told me that a protective order was in place.  Fredrikson & Byron did not show me any protective order, nor did it have me sign any document in which I agreed to be bound by it.  I had no knowledge of it until my attorney Bonner informed me in March, 2009, that there was a claim that a protective order applied to the information.  The Engagement Letter with Fredrikson & Byron required the Firm

9

to inform me immediately of any applicable court order or stipulation regarding the data.

21.     I am familiar with the cost structures used by other computer forensic experts in this area.  I know our rates are very competitive and reasonable within this community.  I believe that the bill we submitted to Fredrikson & Byron is fair and reasonable.

Mark Lanterman

Subscribed and sworn to before me
this _10_ day of _April_

Notary Public

MARCIA MASSEE
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2010

10

STATE OF MINNESOTA                                      DISTRICT COURT

COUNTY OF HENNEPIN                              FOURTH JUDICIAL DISTRICT

---

Extrusion Dies Industries LLC, Gary Oliver,           Court File No. 27-CV-09-6284

              Plaintiffs,

    vs.                                        **DEFENDANT COMPUTER FORENSIC
                                                       SERVICES, INC.'S MEMORANDUM
Computer Forensic Services, Inc.,                      OF LAW IN OPPOSITION TO
                                                       PLAINTIFFS MOTION FOR
          Defendant.                  INJUNCTIVE RELIEF**

---

This is a breach of contract case based on complete non-payment of fees by a law firm

retaining an expert computer forensic consultant.  Fredrikson & Byron LLP retained Computer

Forensic Services, Inc. ("CFS"), executed the retainer agreement, and agreed to pay CFS directly

for its services.   CFS used its labor and skill to create forensic images from computer devices.

Upon those forensic images, CFS also performed labor and skill to restore fragmented, "deleted"

items into a readable format for use by the law firm.  Fredrikson & Byron LLP then failed to pay

a single penny under the contract.  CFS made numerous efforts over months to obtain payment,

to no avail.  Fredrikson & Byron never presented any specifics of which aspects of the bill were

inappropriate, or by how much, or why; the motion for injunctive relief materials provide no

evidence or analysis of those vital points.  CFS scheduled a sale under its statutory liens rights of

the forensic images and other materials it created and upon which it expended labor and skill.  In

response, Fredrikson & Byron, the real party in interest under Rule 17, and an indispensable party

under Rule 19, served and filed this lawsuit in the name of parties with whom CFS has no

1

**EXHIBIT 3**

contract or obligation.

Further, the law firm has an existing, nonconsentable conflict of interest with the plaintiffs under the Professional Rules of Conduct and cannot be their counsel. Fredrikson & Byron has the duty to pay, and it has not. Fredrikson & Byron is also liable and must indemnify CFS under the contract terms for any prospective damages arising from the services performed under the contract, including their failure to pay CFS. Hence, any prospective damages that might be incurred by plaintiffs as a result of the lien foreclosure sale are due to Fredrikson & Byron's breach of contract. CFS will be indemnified for any such speculative damages by Fredrikson & Byron. The same firm which refuses payment and which must indemnify CFS for speculative, future damages arising from that non-payment cannot also zealously represent the same parties that might incur the speculative, future damages. This Court should not grant any relief in this case unless and until Fredrikson & Byron is a named party, and unless and until the corporate plaintiff has retained new counsel.

Even so, CFS is entitled to conduct the lien foreclosure because it is a civil remedy otherwise available to it for nonpayment of contract fees under the Uniform Trade Secrets Act. The protective order is not applicable to the data: CFS is not a party to that order, it was never advised of it prior to entering its contract with Fredrikson & Byron, or prior to performing its services, and or prior to being denied payment. CFS did not learn of it until after scheduling the lien foreclosure sale. By its terms, the protective order does not bind CFS. No other rule of law or equity binds CFS to the plaintiffs, or pretermits exercise of their lien rights. Plaintiffs provide no evidence at all that they can prevail on the core issue: Fredrikson & Byron's complete failure to pay CFS for services rendered. If the court determines that it may allow injunctive relief, then

2

plaintiffs are required to post bond under Rule 65.03, and it should be required to post a bond in the full contract amount, plus attorney's fees as provided in the contract between CFS and Fredrikson & Byron.

**FACTS**

Mark Lanterman of Computer Forensics Service, Inc. ("CFS") was contacted by Fredrikson & Byron attorney Christopher Stafford in late June or early July, 2008.  Affidavit of Mark Lanterman, ¶ 4.  Stafford asked Lanterman to perform expert computer forensic work for his firm, including recovery of deleted data from those computers.   Stafford asked that CFS search the computer devices to determine if Gary Oliver had taken certain computer data; if he had accessed the computer server after he had left the employ of his company, and if computer data had been deleted by Oliver, thereby creating a claim of spoliation. *Id.*

To perform forensic work, CFS analysts gain physical access to the computer and then create an evidentiary copy of its storage device, sector by sector.  It is a perfect copy of exactly what is found on the device and includes everything stored in it.  That evidentiary copy is referred to as the forensic image. *Id.* ¶ 5.  Then, CFS analysts validate the image to make sure that it is, in fact, identical to the information on the original device. *Id.* ¶ 6.  Analysts then encrypt the forensic image with CFS's proprietary software. *Id.* ¶ 7.  Then, CFS can analyze and process the forensic image it created within parameters set by the client, such as searches for key words. *Id.* ¶ 8.

One type of analysis is to recover "deleted" data.  The forensic image can include deleted information such as e-mails, spreadsheets, word processing documents, and the like. *Id.*  When a user hits the delete button for a file, the storage device does not normally fully extinguish and

3

erase the actual data; instead, the computer destroys the computer's ability to "find" and read the file. The delete function essentially releases the sectors containing the file so future storage can take place in those sectors. Further, the "file" itself is in a highly fragmented, unindexed state on the storage device. The forensic expert must locate each bit of information, piece it together, and recreate the full file, and do so file by file. *Id.*

Stafford told Lanterman that Fredrikson & Byron needed CFS to work quickly. Fredrikson & Byron delivered hardware to CFS beginning on or about July 2, 2008 through August 19, 2008. *Id.* ¶ 9. CFS made forensic images and returned the hardware. *Id.* Fredrikson & Byron then provided CFS with search terms and parameters. *Id.* ¶ 10. Lanterman reviewed the data in the forensic images, compared it to the search parameters, and took into account the request to restore data. He then called attorney Stafford and explained to him that the recovery of deleted information would be time consuming and expensive, and the fees could total as much as $100,000. *Id.* Stafford's exact words in response were: "I guess that's just the nature of the beast. Sounds good. Let me know when it's done." *Id.* CFS began work, and meanwhile sent the Engagement Agreement to Fredrikson & Byron. It was returned, signed and executed, with a date of August 26, 2009. *Id.*

CFS completed most, if not all, of the forensic work and billed Fredrikson & Byron with an invoice dated September 30, 2008 directed to lead attorney David Bunde, per Stafford's instructions. The bill totals $86,915.57; it is about $13,000 less than the estimate given to Fredrikson & Byron. *Id.* ¶ 11. Fredrikson & Byron refused to pay the bill. Bunde sent Lanterman a curt letter saying that he thought the bill was a mistake, after which Lanterman contacted Stafford directly. *Id.* ¶ 12. Lanterman told Stafford he did not understand why Bunde

4

thought it was a mistake since the bill was less than the estimate given to Stafford.  Stafford was apologetic to Lanterman, said he did not recall the specific dollar estimate but remembered being told that it would be "expensive."  Stafford told Lanterman that he would take care of it with Bunde.  *Id.*  Bunde contacted Lanterman and again refused payment.  Lanterman left a series of voice messages for Stafford, who did not return his calls.  At no time did Stafford ever tell Lanterman that the bill was unexpectedly high or that it did not contain sufficient detail.  Fredrikson & Byron still has failed to pay one penny of the bill to date.  *Id.* ¶ 13.

Lanterman at CFS continued to try to work with Fredrikson & Byron thereafter to obtain payment, contrary to the moving papers which claim CFS rushed to schedule the lien foreclosure.  CFS had its legal counsel schedule a November 21, 2008 meeting with Bunde, other Fredrikson & Byron attorneys, and the law firm's IT representative.  *Id.* ¶ 15; Aff. of John F. Bonner, ¶ 3-4.  Stafford was not present.  *Id.*  At the lengthy and detailed meeting, Lanterman described in detail what CFS did and how the amounts were reached.  *Id.*  Lanterman also explained that CFS does not create detailed, per task time itemizations as a law firm does, but instead tracks analyst time by when he accesses a given device. Lanterman told Bunde that CFS could show analysts' amount of time on each device, but that he did not believe it would be of much practical use if Bunde was trying to assess individual task of an analyst. *Id.* ¶ 16.

CFS and counsel continued to try to reach resolution with Fredrikson & Byron thereafter.  In December, Bunde wanted CFS to produce a bill for approximately one-half the total amount owed so he could pass it to his client for partial payment.  Then,  CFS would bill Fredrikson & Byron for the other one-half, Bunde would get it paid by the client, and then Bunde would pay CFS in full.  Lanterman Aff., ¶ 17; Bonner Aff., ¶¶ 5-6.  CFS followed Bunde's request and sent

the first of two invoices, then CFS's counsel sent the second invoice on January 9, 2009.

Lanterman Aff., ¶ 17; Bonner Aff., ¶ 6.   CFS did not receive any payment, even after following

Bunde's request.  Lanterman Aff., ¶ 17.

CFS's counsel continued to contact Bunde to obtain payment, to no avail.  Bonner Aff. ¶

7-8.   Fredrikson & Byron has not provided any basis to CFS to reduce its bill, or why the parties

should engage in "mediation," other than the bill is "too high."  Lanterman Aff., ¶ 18.

All of Lanterman's communications relating to CFS's retention by Fredrikson & Byron,

its services, and lack of any payment to date, was done with Fredrikson & Byron.  *Id.* ¶ 3.  The

Engagement Agreement attached to attorney Christopher Stafford's March 26, 2009 affidavit as

Exhibit B, states throughout that CFS and Fredrikson & Byron are the contracting parties.

Lanterman, on behalf of CFS, works with many law firms and other entities, knows what it is to

be hired as an expert, and understood that Fredrikson & Byron retained CFS to be its computer

forensic experts and treated them as such. *Id.* ¶ 13.  Lanterman agreed on behalf of CFS to

perform the work as he did because Fredrikson & Byron is a local law firm that he has dealt with

in the past.  Lanterman, on behalf of CFS, did not contract with an out-of-state entity that is not

even mentioned in the Engagement Agreement. *Id.*

None of Stafford, Bunde, or any other attorney at Fredrikson & Byron told CFS that a

protective order was in place.  Fredrikson & Byron did not show the protective order to

Lanterman, nor did it have CFS sign any document in which it agreed to be bound by it.  Neither

Lanterman nor CFS had any knowledge of it until March, 2009, even though the Engagement

Letter with Fredrikson & Byron required the Firm to inform Lanterman immediately of any

applicable court order or stipulation regarding the data.  Lanterman Aff., ¶ 20; Stafford Aff.,

3/26/09, Exh. B, ¶ 6.

## LEGAL ARGUMENT

**I.    FREDRIKSON & BYRON LLP HAS A NONCONSENTABLE CONFLICT OF INTEREST WITH THE PLAINTIFFS DUE TO ITS FAILURE TO PAY UNDER THE CFS CONTRACT.**

As an initial matter, Fredrikson & Byron cannot represent the plaintiffs in this case under

Minnesota Rules of Professional Conduct 1.7 and 3.7 because it has a pending, "nonconsentable"

conflict between itself and the plaintiffs.

Rule 1.7 provides:

(a)    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

    (1)    the representation of one client will be directly adverse to another client; or

    (2)    there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person, or by a personal interest of the lawyer.

(b)    Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

    (1)    the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

    (2)    the representation is not prohibited by law;

    (3)    the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

    (4)    each affected client gives informed consent, confirmed in writing.

Fredrikson & Byron's conflict falls under both (a)(1) and (a)(2). As one of its lawyer admits, Fredrikson & Byron contracted with CFS to obtain expert computer forensic services. Stafford Aff., 3/26/09, ¶ 3 ("Fredrikson & Byron retained Computer Forensic Services, Inc. ("CFS") to perform forensic examinations of several hard drives at issue in the case pursuant to an Engagement Agreement"); Exh. B, first sentence ("Computer Forensic Services, Inc. ("CFS") agrees to be retained by Fredrikson & Byron to provide forensic services.") Fredrikson & Byron has the duty to pay. *See* Stafford Aff., 3/26/09, Exh. B, ¶ 3(a) ("Fredrikson & Byron agree to payment of the invoice amount within thirty (30) days of the invoice date."). CFS is exercising its lien rights under applicable law for materials in its possession based on Fredrikson & Byron's failure to perform. Apparently because its failure would adversely color the trade secret allegations, the law firm has placed its clients as party-plaintiffs (including for a breach of contract claim to which EDI and Oliver are not parties, much less mentioned).

Plaintiffs EDI and Oliver claim they might be harmed by the sale, citing application of confidentiality agreements and court protective orders of which CFS was never notified or made a party. Lanterman Aff., ¶ 20; Bonner Aff., ¶ 9. Fredrikson & Byron breach the contract by failing to inform CFS of any such protective order. The Engagement Agreement, paragraph 6, states: "Fredrikson & Byron agree to immediately provide CFS with any relevant court order or stipulation regarding the handling of any confidential information." Stafford Aff., 3/26/09, Exh. B. Further, Fredrikson & Byron is required to indemnify CFS for any damages that will be caused by the law firm's failure to pay. Paragraph 5 of the Engagement Agreement states: "Fredrikson & Byron warrants it has the authority to submit the data, materials, equipment, or information it is providing to CFS to provide computer forensic services. Fredrikson & Byron

8

agree that it will hold harmless and indemnify CFS for any damages or claims arising out of the services performed on this project, except if damages or claims have arisen through the negligence of CFS."  Stafford Aff., 3/26/09, Exh. B.

Any damage that plaintiffs might conceivably suffer will be caused by their own law firm's failure to pay.  As set forth in the next section, when required to submit an Answer, CFS will bring breach of contract, contribution, indemnity, and other potential claims against Fredrikson & Byron.  This is a nonconsentable conflict in this very same litigation relating to the contract in question.

In addition, Fredrikson & Byron attorneys will be fact witnesses at trial given their contractual relationship with CFS.  Under Rule of Professional Conduct 3.7, "A lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9." Attorney Stafford will have to testify regarding his communications with Lanterman, including his knowledge of the cost estimate of $100,000.  Stafford has disappeared from these proceedings on these vital points; he will not remain so.  Both Stafford and Bunde are witnesses regarding the failure to perform under the contract, including how that failure led to the lien sale.  Both will have to testify about their failure to inform CFS of any protective order in the federal case, and to have CFS agree to review it and abide by it.  The Firm's existing, nonconsentable conflict under Rule 1.7 precludes it from representing plaintiffs here.

9

## II.   FREDRICKSON & BYRON IS A NECESSARY PARTY UNDER MINN.R.CIV.P. 19, AND A REAL PARTY IN INTEREST UNDER RULE 17.  ITS ABSENCE AS A PARTY IN THIS LAWSUIT IS GLARING.

The contract is between Fredrickson & Byron and CFS.  It is for provision of expert services by CFS to that law firm.  CFS performed; Fredrikson & Byron did not.  Fredrikson & Byron is not a named party, and instead places its clients on the firing line.  The court should refrain from considering the exercise of injunctive relief until the real party in interest, which is also an indispensable party, is a named party.

Minnesota Rule of Civil Procedure 17.01 states, "Every action shall be prosecuted in the name of the real party in interest."  Fredrikson & Byron is the real party interest relating to its refusal to pay under its contract.  Yet Fredrikson & Byron is not the named plaintiff, even with Count I as a breach of contract count.

Further, Fredrikson & Byron is an indispensable party under Minn.R.Civ.P. 19:

A person who is subject to service of process shall be joined as a party in the action if (a) in the person's absence complete relief cannot be accorded among those already parties, or (b) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (1) as a practical matter impair or impede the person's ability to protect that interest or (2) leave any one already a party subject to substantial risk or incurring double, multiple, or otherwise inconsistent obligations by reason of the person's claimed interest.

Complete relief cannot be afforded in this case without Fredrikson & Byron, one of the two parties to the contract, as a party.  When required to submit an Answer, CFS will bring a breach of contract claim against it.  Further, there are interests here that cannot be adequately protected without Fredrikson & Byron as a named party, with a zealous advocate unhindered by the existing conflict of interest: CFS will seek contribution and indemnity claims against Fredrikson & Byron for any damages that the plaintiffs might incur due to Fredrikson & Byron's

10

failure to pay CFS under Paragraph 5 of the Engagement Agreement.

As argued below, the trade secret law does not apply to the lien sale because CFS has the legal right to foreclose its lien under the Uniform Trade Secrets Act as an available civil remedy. If plaintiffs suffer any damage, their recourse is against their own law firm for its breach of contract. Further, Fredrikson & Byron failed to make CFS aware of, or have CFS agree to be bound by, the protective order as required under Paragraph 9. If damages result from the law firm's failure to follow that protective order, advise CFS of it, and have CFS agree to abide by it, then plaintiffs have claims against Fredrikson & Byron, not CFS. In any event, CFS will have claims against the law firm for any of those prospective, potential damages. The present ruse, in which Fredrikson & Byron uses the current plaintiffs as shields from its own contract breach, cannot withstand Rules 17 and 19.

## III.   CFS HAS PROTECTED LIEN RIGHTS IN THE MATERIALS IT CREATED AND TO WHICH IT EXPENDED LABOR AND SKILL.

CFS has a lien right in the materials it possesses. CFS created the forensic images, then it added value and expended skill upon it. To compare CFS's efforts to a passive ghostwriter keeping possession of a scrap book under a non-existent state law artist's lien does not pass the straight-face test. CFS is fully within Sections 514.18 through 514.22, and it has the right to foreclose its lien subject to payment in full by Fredrikson & Byron.

Plaintiffs do not quote the initial lien statute, Section 514.18, in their memorandum:

> Whoever, at the request of the owner or legal possessor of any personal property, shall *store or care for or contribute in any of the modes mentioned in section 514.19 to its preservation, care, or to the enhancement of its value,* shall have a lien upon such property for the price or value of such storage, care, or contribution, and for any legal charges against the same paid by such person to any other person, and the right to retain possession of the property until such lien is lawfully discharged. (emphasis added)

11

Section 514.19 then states: "A lien and right of detainer exists for: ...(2) keeping or storing property, other than harvested crops or livestock, as a bailee but not as a warehouse operator under article 7 of the Uniform Commercial Code; ...(4) *making, altering* or *repairing* any article, other than livestock, *or expending any labor, skill or material on it*...The liens embrace all lawful charges against the property paid to any other person by the person claiming the lien, and the price or value of the care, storage or contribution and all reasonable disbursements occasioned by the detention or sale of the property." (emphasis added).

As fully set forth in Mark Lanterman's affidavit in paragraphs 5 through 9, and paragraph 19, CFS preserves, enhances, and adds value to the computer data, and it certainly expends labor and skill on it. CFS creates the forensic image, sector by sector, from the physical device produced to it. The forensic image is new value created through the skill of CFS analysts. Lanterman Aff., ¶¶ 5, 19. Then, CFS encrypts the forensic images in its proprietary software, again expending labor and skill, as well as adding value because it safeguards the data. *Id.* ¶¶ 7, 19. Third, CFS actively works in the sectors of the forensic image to piece together and recreate documents (such as Word documents, emails, internet usage histories, chat conversations) from the deleted data fragments that otherwise are no longer accessible or visible by the computer user. CFS then compiles those restored documents in a new, readable format. *Id.* ¶¶ 8, 19. That is a creation of new material through expenditure of labor and skill, and it adds value to the raw data initially forwarded to it. Then, CFS expends labor and skill upon the new product by conducting searches and other analysis for the client. *Id.* ¶ 8.

CFS holds a lien in the product it produced, *i.e.*, the forensic image and all recovered data and deliverables. CFS's efforts amply meet the statutory requirements.

12

## IV.   THE TRADE SECRETS LAW DOES NOT PREEMPT CFS'S LIEN RIGHTS, NOR IS CFS A PARTY TO THE PROTECTIVE ORDER.

The Uniform Trade Secrets Act does not give rise to any cause of action by the plaintiffs against CFS.  Section 325C.07 provides that the Acts provisions "do not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret; or (2) other civil remedies that are not based upon misappropriation of a trade secret."  CFS's performance as an expert for Fredrikson & Byron was performed through a contract which Fredrikson & Byron has breached through nonpayment, among other reasons.  CFS is entitled to pursue its "other civil remedies," specifically the lien foreclosure statutes under Minn.Stat. §§ 514.18-.22.  Plaintiffs do not provide any Minnesota law to the contrary on point.  The case law cited by Plaintiffs from other jurisdictions, from the 1980's, are not remotely similar to the services provided by CFS and the underlying facts in this case.

Moreover, Fredrikson & Byron never provided the protective order to CFS prior to service of the notice of sale.  Lanterman Aff., ¶ 20.  Lanterman did not have contact with Plaintiffs.  *Id.* ¶ 3.  CFS never reviewed or executed any document agreeing to be bound by the protective order.  CFS did not know of, nor sign, the "Written Assurance" binding itself to the protective order and the Wisconsin federal court's jurisdiction.  The protective order at paragraph 7 provides that persons designated as being covered by the protective order shall execute the "Written Assurance." *Id.* ¶ 20; Bonner Aff., ¶ 9.  None of the materials originally provided to CFS were designated "confidential" under the protective order.  Plaintiffs provide no basis to now apply a federal civil case protective order from a district outside of Minnesota to non-party CFS.

13

**V.   GIVEN THE APPLICABLE LAW AND FACTS, PLAINTIFFS DO NOT MEET THE *DAHLBERG* FACTORS FOR INJUNCTIVE RELIEF.**

Given the applicable fact situation and law, Plaintiffs cannot meet their burden for injunctive relief under the five factors set forth in *Dahlberg Brothers, Inc. v. Ford Motor Co.*, 137 N.W.2d 314 (Minn. 1965); *see also Unlimited Horizon Marketing, Inc. v. Precision Hub, Inc.*, 533 N.W.2d 63, 65-66 (Minn.App. 1995).

**A.   The Nature Of The Relationship Between Plaintiffs and Defendant.**

There is no present relationship.  CFS contracted with Fredrikson & Byron.  Fredrikson & Byron had the duty to perform and pay.  Lanterman Aff., ¶¶ 3-4; Stafford Aff., 3/26/09, Exh. B. CFS's communications, through Lanterman, were with Fredrikson & Byron.  The law firm breached.  Granting the present motion would lend credence to plaintiffs claims that there is a contractual and other relationships between plaintiffs and CFS that do not presently exist.  It would further cloud what is currently clear: CFS and Fredrikson are the real parties in interest.

**B.   Harm To Plaintiffs If Injunctive Relief Is Denied Versus Harm To Defendant If It Is Granted.**

The materials to be sold by CFS are encrypted in proprietary software; in its present state, no harm would befall plaintiffs from such encrypted material.  Further, avoidance of sale of the encrypted software by plaintiffs is easily prevented by having their law firm pay its long overdue bill to CFS, or by plaintiffs showing up at the sale and buying the lien rights, *i.e.*, effectively paying the outstanding bill.  Then this case centers on the real dispute: Fredrikson & Byron's failure to pay under the Engagement Agreement.  Granting injunctive relief creates an administrative burden for everyone involved, increases costs, adds plaintiffs as parties to a case in which they should not be involved, and delays yet further CFS's available civil remedies.

14

## C.      There Is Little Likelihood Plaintiffs Will Prevail On The Merits.

Plaintiffs have presented the Court and CFS with a hodgepodge of claims and allegations (eight so far), apparently hoping one of them will stick to the proverbial wall.  On the core issue of non-payment under the contract, plaintiffs provide no admissible evidence of what aspects, or by how much, the bill is wrong.  Nothing.  No expert analysis; no statement of an IT professional or forensic expert regarding the work performed versus the invoice price; no testimony regarding deviation from the contract provisions versus the ultimate price.  Attorney Stafford, who was given the cost estimate, is mysteriously absent.  He submitted an affidavit, but says nothing about how the scope of work deviated from his instructions or the estimate given by CFS.  Plaintiffs have provided nothing to this Court that they will prevail on the merits regarding the contract amount due to CFS.

Regarding Count I ("Breach of Contract"), there is no contractual relationship between plaintiffs and CFS, nor were those plaintiffs ever intended beneficiaries.  The Engagement Letter is between the law firm and the expert consultant.  Fredrikson & Byron is a large and reputable law firm.  It certainly knows how to hire an expert witness, and why.  Lanterman was hired to be, and was treated as, an expert.  Lanterman Aff., ¶¶ 2, 3, 13.  The Plaintiffs are not mentioned anywhere in the document.  CFS was never even given the protective order in the underlying litigation under after the notice of sale was served.  *Id.* ¶ 20; Bonner Aff., ¶ 9.  All of CFS's contacts were with the local law firm; all bills were sent to it; and all discussions regarding payment were with it.  Only until crafting the original complaint, with the improper allegation in paragraph 12 that EDI retained CFS in the August 26, 2008 Engagement Letter, did anyone

15

purport to claim that EDI was in a contractual relationship with CFS.[1]  There is none.

Count II claims a fiduciary relationship between CFS and plaintiffs.  Once again, there was no contact between CFS and plaintiffs throughout CFS's provision of services to Fredrikson & Byron.  CFS did not assume any fiduciary relationship with plaintiffs, who are not mentioned anywhere in the Engagement Agreement.  Plaintiffs' fiduciary relationship is with their law firm, Fredrikson & Byron, the same entity that is refusing to pay its contract with CFS.  Their breach of fiduciary duty claim, if any, arises against its own law firm, yet another reason why Fredrikson & Byron have a current, nonconsentable conflict of interest with plaintiffs.

Count III, a conversion claim, also lacks merit.  CFS received the hardware under the Engagement Agreement from Fredrikson & Byron.  There is no allegation, to CFS's knowledge, that Fredrikson & Byron improperly delivered that hardware.  Under the contract, the law firm represents and warrants that it had the right to deliver it.  Stafford Aff., 3/26/09, Exh. B, ¶ 5. CFS performed the work it was contracted to do.  CFS is unpaid for that work.  CFS is pursuing a civil remedy available to it under the lien statute (Minn.Stat. §§ 514.18-.22), hence the exception to the Uniform Trade Secrets Act under Minn.Stat. § 325C.07 applies.  There is no unlawful conversion of plaintiffs' putative "Confidential Information," any more than Wells Fargo unlawfully engages in "conversion" when it forecloses on a home in which it has a security interest.

Count IV ("Misappropriation of Confidential Information"), Count V ("Theft of Trade Secrets"), Count VI ("Unjust Enrichment"), Count VII ("Tortious Interference with Prospective

---

[1]     After service of a Rule 11 notice letter on March 31, 2009, whose 21-day notice period is still running, did plaintiffs serve the Amended Complaint to admit the obvious: Fredrikson & Byron retained CFS.

Advantage"), Count VIII ("Violation of Computer Fraud and Abuse Act"), suffer the same fate.

CFS contracted with Fredrikson & Byron, performed the work contemplated by the Engagement

Agreement, and Fredrikson & Byron breached by non-payment.  CFS has the legal right to

pursue the civil remedies available to it, including the lien foreclosure sale, once Fredrikson &

Byron breached.  Non-payment by Fredrikson & Byron was material, and it permits CFS to sell

the materials in its possession under Minn.Stat. §§ 514.18-.22.  Any claims for damages that

plaintiffs might have are against their own law firm or, in the alternative, Fredrikson & Byron is

liable for indemnification to CFS under paragraph 5 of the Engagement Letter ("Fredrikson &

Byron warrants it has the authority to submit the data, materials, equipment, or information it is

providing to CFS to provide computer forensic services.  Fredrikson & Byron agree that it will

hold harmless and indemnify CFS for any damages or claims arising out of the services

performed on this project, except if damages or claims have arisen through the negligence of

CFS.")  CFS was not made aware of, nor signed, consent to be bound by the Wisconsin district

court's protective order.  Lanterman Aff., ¶ 20; Bonner Aff., ¶ 9.  And, most importantly,

Fredrikson & Byron, as well as plaintiffs, can prevent the sale before it happens by paying the

outstanding invoice.

### D.    Public Policy Does Not Favor Eliminating CFS's Lien Rights And Rewarding The Breaching Law Firm.

CFS signed the Engagement Letter with Fredrikson & Byron with the existing lien

statutes in place.  CFS had the lien as an available civil remedy.  CFS contracted with a local law

firm that had paid its bills in the past.  Now, plaintiffs, out-of-state entities, want to insert

themselves as the "true" unnamed mystery parties to the contract; enjoin CFS's lien remedy; and,

continue not to leave CFS without any payment.  No public policy argument supports redrafting a

binding contract to which a major law firm is a party to permit that law firm to avoid its payment

obligation.  No public policy argument supports revoking the applicable lien statutes.

### E.    Administrative Burden.

The administrative burden likely will be small.  Plaintiffs will be required to post bond,

but it is not anticipated that the Court will have other administrative duties.

## VI.    IF THIS COURT GRANTS INJUNCTIVE RELIEF, THE MOVING PARTIES MUST POST BOND.

CFS does not believe injunctive relief is appropriate.  Without waiving its position, if this

court grants injunctive relief, then plaintiffs must post bond in the amount of the outstanding

contract damages, plus an allotment for CFS's attorney's fees necessitated in their collection

efforts.

Minnesota Rule of Civil Procedure 65.05 states:

(a) No temporary restraining order or temporary injunction shall be granted except upon
the giving of security by the applicant, in such sum as the court deems proper, for the
payment of such costs and damages as may be incurred or suffered by any party who is
found to have been wrongfully enjoined or restrained.

CFS has the right to exercise its lien due to Fredrikson & Byron's refusal to pay under the

applicable contract.  The contract amount is $86,915.57.  Further, CFS has a contractual right to

its attorney's fees: "Any and all parties that fail to abide by the prices, terms and conditions of

this agreement, agree to pay costs of collection and attorney's fees incurred by the compliant

party or parties regarding that failure, regardless of whether a suit is filed, and including any post-

judgment fees and costs."  Stafford Aff., 3/26/09, Exh. B, ¶ 9.

18

## VII.    CONCLUSION

This Court should not proceed due to the pending, nonconsentable conflict between plaintiffs and its law firm, Fredrikson & Byron.  Further, the law firm is the real party in interest and is an indispensable party under Rules 17 and 19.  No equitable relief should be granted given the glaring absence of that party as a named plaintiff in these proceedings.  Nonetheless, Computer Forensic Services, Inc. ("CFS") has a legally-cognizable lien in the materials in its possession.  Fredrikson & Byron failed to pay CFS under the expert contract at issue.  CFS has the legal right to foreclose the lien at the sheriff's sale.  Plaintiffs have not met their legal requirements to enjoin the sale.  If this court determines that any injunctive relief is appropriate, then it should be conditioned upon plaintiffs posting a $125,000 bond, or cash payment into the Court's trust account.

Dated: April _10_, 2009

BONNER & BORHART LLP

By_____
    John F. Bonner (#09726)
    Robert J. Borhart (#248460)
U.S. Bank Plaza, Suite 1950
220 South Sixth Street
Minneapolis, MN 55402
(612) 313-0711
*Attorneys for Defendant Computer Forensic Services, Inc.*

19