UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CLOEREN INCORPORATED,

                Plaintiff,

    vs.                   Case No. 09-CV-215-SLC

COMPUTER FORENSIC SERVICES,    Madison, Wisconsin
INC.,                      April 14, 2009
                          11:00 a.m.
              Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF INJUNCTIVE HEARING
HELD BEFORE CHIEF JUDGE BARBARA B. CRABB

APPEARANCES:

For the Plaintiff:  Reinhart Boerner Van Deuren s.c.
                  BY:  KATIE D. TRISKA
                  1000 North Water Street, Suite 2100
                  Milwaukee, Wisconsin  53202

For the Defendant:  DeWitt, Ross & Stevens, S.C.
                  BY:  ANTHONY R. VARDA
                  Two E. Mifflin Street, Suite 600
                  Madison, Wisconsin  53703

CHERYL A. SEEMAN, RMR, CRR
Official Court Reporter
United States District Court
120 North Henry Street, Room 520
Madison, Wisconsin  53703
1-608-255-3821

1          THE CLERK:  Case No. 09-CV-215, *Cloeren*

2  *Incorporated v. Computer Forensic Services,*

3  *Incorporated*, called for an injunctive hearing.  May

4  we have the appearances, please?

5          MS. TRISKA:  Katie Triska from Reinhart,

6  Boerner and Van Deuren on behalf of the plaintiff,

7  Cloeren Incorporated.

8          THE COURT:  Thank you.

9          MR. VARDA:  Anthony Varda of DeWitt, Ross &

10  Stevens, Madison, appearing on behalf of Computer

11  Forensic Services, Inc.

12          THE COURT:  Thank you.  And, Ms. Triska,

13  first of all, do you know anything about the bond?

14          MS. TRISKA:  I sent an e-mail to counsel at

15  Frederickson and Byron, who is representing EDI and

16  Oliver, around 9:30 this morning and asked for an

17  update.  As of that time, they had not posted the bond

18  and I asked to be updated if they did post it, and I

19  have not received any additional communications.

20          MR. VARDA:  Your Honor, we contacted them

21  yesterday and they bluntly told us that they wouldn't

22  tell us whether they are going to file it or not.

23          THE COURT:  And are you talking about the law

24  firm or EDI?

25          MR. VARDA:  The law firm.  I think they are

1   waiting to see what the outcome is here to see if they

2   can get by without posting a bond.

3           THE COURT:  Well, they are in big trouble.

4   But I think, Mr. Varda, we do have a jurisdictional

5   problem here.  I don't know any way that I can

6   exercise any jurisdiction over either the law firm or

7   CFS.  If Cloeren -- is that how you pronounce it?

8           MR. VARDA:  Cloeren.  I think that sounds

9   right.

10          MS. TRISKA:  Cloeren.

11          THE COURT:  -- if Cloeren were a Wisconsin

12  resident, it might be the recipient of an injury in

13  this state, but it's not even a resident.  As I

14  understand it, it's in Texas.

15          MS. TRISKA:  That's correct, Your Honor.

16          THE COURT:  Ms. Triska, do you have any idea

17  how I could exercise jurisdiction over CFS?

18          MS. TRISKA:  Sure.  We believe, in this case,

19  there is specific jurisdiction based on four factors.

20  One, CFS accepted an engagement for an action

21  proceeding in the Western District of Wisconsin.  The

22  hard drives that were analyzed came from the Western

23  District of Wisconsin, specifically EDI located in

24  Chippewa Falls.  CFS was subject to a protective order

25  that was entered in the Western District of Wisconsin.

1   And interestingly enough, prior to EDI's engagement of

2   CFS, Reinhart engaged CFS for services in that same

3   action.

4           THE COURT:  But paid its bill?

5           MS. TRISKA:  Correct.  And in addition, Your

6   Honor, if we had an opportunity for a little

7   discovery, we believe that general jurisdiction would

8   exist as well.  I personally know of a matter before

9   the Milwaukee County Circuit Court in which CFS is

10  engaged as the expert witness.

11      In addition, CFS's website is an interactive

12  website which courts have found before would render

13  the company subject to jurisdiction on that basis

14  alone.  If you go to their website, there is links to

15  click for additional information, services that they

16  provide.

17      And I would be happy to also provide the Court

18  with the engagement agreement Reinhart entered into

19  with CFS in connection with the action proceeding in

20  the Western District of Wisconsin.

21          THE COURT:  So you are saying because CFS was

22  doing a forensic examination for a lawsuit in

23  Wisconsin for EDI?

24          MS. TRISKA:  Correct.  The hard drives that

25  are -- a portion of the hard drives at issue here came

1   from EDI, which is located in Wisconsin.

2           THE COURT:   Anything else?

3           MS. TRISKA:   That's it for now, Your Honor.

4   But again, if we had time for additional discovery, we

5   believe we would be able to establish general

6   jurisdiction in addition to specific jurisdiction.

7           THE COURT:   You engaged, "you" being

8   Reinhart, engaged CFS in this lawsuit?

9           MS. TRISKA:   In the action that was pending

10  before Judge Crocker, correct.

11          THE COURT:   And it gave you some report on

12  the materials it looked at?

13          MS. TRISKA:   For the purposes of our

14  engagement, we had asked them to make images of

15  certain hard drives and so that was the extent of

16  their engagement.  A few months later then, or maybe

17  it was just a month later, EDI engaged them,

18  unbeknownst to us.  I don't know that they have a

19  conflict system, but that's how the timeline of events

20  occurred.

21          THE COURT:   So what you asked them to do is

22  essentially what EDI asked them to do, but you were

23  asking them to look at EDI hard drives, I assume?

24          MS. TRISKA:   Reinhart engaged them to copy

25  EDI hard drives and then we asked them to ship them to

1    another computer company in Texas where the analysis

2    would be done, but we engaged them for the limited

3    purpose of making what they call *forensic copies* that

4    has the metadata contained in it.

5            THE COURT:  So you are saying that because of

6    that because of the work they are doing for a lawsuit

7    in Milwaukee, and the fact that the hardware came from

8    a Wisconsin citizen, EDI, that that means that they

9    are doing, actively doing, business in this state; is

10   that your position?

11           MS. TRISKA:  Yes, that's my position, but

12   both that there is specific jurisdiction based on the

13   previous proceeding in the Western District of

14   Wisconsin, and I outlined the four or five substantial

15   contacts relating to that.  And in addition, I believe

16   that there is also general jurisdiction based on their

17   work generally in Wisconsin, related and unrelated to

18   the *EDI-Cloeren* matter.

19           THE COURT:  Mr. Varda.

20           MR. VARDA:  Yes.  I'm learning new things

21   here this morning that weren't in the paperwork filed.

22   My understanding was that if that was the argument

23   they wanted to make, it should have been in the

24   paperwork so I could at least have talked to my

25   clients about it.

1       However, from what little I heard here this

2   morning, the hard drives were sent to Minnesota.   We

3   were not supposed to give them anything back out of

4   that.   We weren't sending anything into Wisconsin.

5   The hard drives from that earlier case were sent to

6   Minnesota and we then, my client sitting in Minnesota,

7   sent something to Texas for them, still didn't come

8   into Wisconsin.

9       There is no claim that they were supposed to --

10  that they contractually agreed to come and testify in

11  Wisconsin and be subject to jurisdiction.   They are

12  sitting up in Minneapolis primarily dealing with a

13  Minneapolis law firm in this case.   What is at issue

14  here are the materials from the contract with the

15  Frederickson law firm, and that's it.

16      We have offered to remove the forensic copy, the

17  images, of the hard drives from Cloeren from the sale.

18  We have offered to do that.

19          THE COURT:   And explain to me what that would

20  mean.

21          MR. VARDA:   That means the images that we

22  created that can then be analyzed for forensic

23  purposes out of their hard drives, we have agreed to

24  take that out of the sale.   We are not going to sell

25  those.

1            THE COURT:   Okay.   So all of the materials

2    that EDI wanted to produce will not be in the sale.

3    Are they also removed from the hard drive so that

4    somebody looking at the hard drive could no longer see

5    those images?

6            MR. VARDA:   We are just going to give them a

7    hard drive back.   They are hard drives.   We will give

8    them back to them.

9            THE COURT:   So what are you selling?

10            MR. VARDA:   We are selling the images and

11    hard drives we received from Extrusion Dies

12    Industries, the other side of the lawsuit.

13            THE COURT:   But weren't those from Cloeren?

14            MR. VARDA:   Well, that's the question, was

15    there something on their hard drives that came from

16    Cloeren that was privileged or a trade secret, and

17    nobody knows.   That was what the lawsuit was about,

18    but they settled the lawsuit.

19        But getting back to jurisdiction -- and frankly,

20    and venue, because we think it should be dismissed for

21    lack of venue here -- I mean, there is nothing

22    substantially related in the Western District.   Our

23    work was completely outside of court, wasn't coming to

24    court.   It's up in Minnesota.   They never ventured

25    into Wisconsin to do anything.   All the witnesses,

1   everything, is up in Minnesota.

2          THE COURT:  They must have solicited some

3   business.

4          MR. VARDA:  Well, they solicit generally,

5   like most people do, you know.  Our law firm, for

6   example, has a website that will go anywhere.  So,

7   yes, you do have that with the Internet, virtually any

8   company now does.  But I don't think that completely

9   eliminates all notions of fundamental fairness in

10  where venue should be and jurisdiction.

11      This was work done exclusively in Minnesota.  We

12  never received any protective order.  Nobody served it

13  on us.  They weren't even aware of the protective

14  order.  I don't know if the protective order was

15  something simply stipulated by the parties and signed

16  by the court based on the stipulation or it was a

17  protective order that the court rendered a decision on

18  based on evidence that there was something to be

19  protected, two different categories of protective

20  orders.

21         THE COURT:  We are kind of picky in this

22  court about making lawyers show that there is

23  something that needs protection.  Now, I haven't

24  looked exactly at the one that was signed in the other

25  lawsuit, but we do send them back regularly, once a

1   week probably, saying "Please tell us -- you can't

2   just come in here and say you need a protective order.

3   You have to tell us why."

4           MR. VARDA:  I wish the state court had the

5   same attitude.  But anyway, I think there is a serious

6   problem with jurisdiction.  I mean, they are from

7   Texas.  You know, the tenuous connection here is that

8   the hard drive came from here, but they sent it to a

9   different state for work that was never even going to

10  come back to them, so we are not sending our work

11  product into Wisconsin in either of these cases.  It's

12  not a contract for goods to be used in Wisconsin.  Our

13  contract was with the Frederickson law firm and we

14  would have just turned it over to them.

15          THE COURT:  Although I thought from what

16  Ms. Triska said that the earlier work, the forensic

17  images, were returned to Wisconsin.

18          MR. VARDA:  No.  They were sent to Texas.

19  What she said is they went to Texas for analysis.

20          MS. TRISKA:  If I may clarify, in fact the

21  hard drives were sent to Reinhart for us to send to

22  Texas.

23          THE COURT:  But not -- okay.  This is a

24  strange case.  It seems so bizarre to me that a

25  company granted -- it seems to have a very legitimate

1  claim against the law firm and EDI for not paying a

2  bill that it contractually agreed to pay, but the idea

3  that it thinks it can sell somebody else's private

4  data --

5          MR. VARDA:  Well, apparently, and I'm not a

6  Minnesota lawyer, but apparently this is straight

7  down-the-book Uniform Commercial Code in Minnesota,

8  they can go sell it.  You can see, however, that it is

9  also a strong leverage point to getting paid.

10     And of course the Frederickson firm could pay the

11  bill under protest and sue, claiming it was an

12  excessive bill, if they wanted to stop this.  But

13  apparently they would rather -- what they did up there

14  was they brought a lawsuit on behalf of their clients,

15  representing their clients, asking for an injunction

16  and then they had to put the $125,000 bond in to keep

17  it from being sold.

18     So I think the judge up there did rough justice

19  to get collateral, cash collateral, in lieu of this,

20  because this is the only collateral they had.  It does

21  seem a bit strange, but --

22          THE COURT:  You know, my understanding of the

23  Uniform Commercial Code is if I take a car in to Joe

24  Smith's Auto Repair; he does the repair, I don't pay

25  for it; he can keep the car.

1        MR. VARDA:  He can sell the car if he follows

2   the procedure, which is how this got --

3        THE COURT:  I didn't think that if I took my

4   neighbor's car in or the car I stole in that he could

5   sell it.

6        MR. VARDA:  No.  What's happening here -- you

7   are misconstruing what we are selling.  We are not

8   selling -- we are not selling the hard drives and so

9   on.  We are selling the images that we created.  Our

10  work product is going to be sold.

11       THE COURT:  But aren't those images -- and if

12  you were doing the work you were contracted to do,

13  those are images showing e-mails from Joe to Tom and

14  Sam to Sarah about what Mr. Oliver was doing and what

15  he knew and all these secrets that he knew.

16       MR. VARDA:  Well, the Frederickson law firm

17  was his agent for that purpose.  It would be as though

18  your neighbor contracted with you to take the car in

19  and you took the car in on behalf of the neighbor and

20  with the neighbor's permission and then you didn't pay

21  for it, and neither did the neighbor, and the mechanic

22  went out and sold it.

23       THE COURT:  Yeah.  But here, Frederickson,

24  first of all, blew it by not handing over the

25  protective order making sure that CFS was aware of the

1   order.

2           MR. VARDA:   That's true.

3           THE COURT:   But then what about the criminal

4   penalties that are lurking out there for what CFS

5   plans to do?

6           MR. VARDA:   The fundamental problem here is

7   that no one has actually made a determination that any

8   theft of trade secrets or transfer of trade secrets

9   have occurred.  I have been in a lot of lawsuits where

10  people claim things to be trade secrets and when you

11  get down to it, they simply aren't.

12          THE COURT:   There is always the possibility.

13          MR. VARDA:   There is a host of possibilities.

14  The interesting thing here is that in settling their

15  lawsuit between the parties, apparently they left,

16  whatever Extrusion Die Industries and Mr. Oliver

17  allegedly took, they left them in possession of that

18  material and their selling it apparently anticipates

19  they will just keep it.

20      I guess, because they settled, they don't want to

21  pay the expense of determining whether they actually

22  stole anything or not.  We really don't know whether

23  anything got stolen or not at this point and they have

24  decided not to find out and that's how they settled

25  their lawsuit.

1          So that brings us all full circle around to this

2    was just the expert hired in Minneapolis to do some

3    work in Minneapolis that was supposed to be followed

4    up on elsewhere by other people and they are hauled in

5    to court both here and Minneapolis.  There is an

6    injunction entered in Minneapolis.

7          But as I noted earlier, I think what's going on

8    is they are trying to see if they can get by without

9    posting the bond in Minneapolis.  If this court

10   decides not to issue a temporary restraining order, I

11   have every confidence in the world that the

12   Frederickson firm will see it possible to actually

13   issue their bond, get their bond in.

14         We did suggest to Cloeren that we would be happy

15   to sell it to them, too, and they can settle this

16   between them.  They haven't finished their final

17   settlement document as between the two of them and

18   they can resolve it as part of that, if they want.

19   But this is the only collateral we have and, you know,

20   apparently under Minnesota law, it's perfectly

21   possible to go and sell it.  We don't know of any

22   trade secrets that are actually involved here.

23         So I don't think the sale is going to happen,

24   regardless either way of what this court does, but I

25   see serious problems in both jurisdiction and venue.

1  And the alternative -- the option on a venue question

2  would be to send it to Minneapolis so it can at least

3  be resolved in the same place where all witnesses are,

4  or dismissal.  If there is no venue, then we can

5  dismiss here and then they can refile up in Minnesota.

6  I suppose they would have it filed almost immediately.

7       But as I said, we are pulling -- the materials

8  that they sent us are not at issue here, we are taking

9  that out, so I really don't understand how they have

10 standing to object to our selling what belongs to

11 Extrusion Die Industries without some evidence or

12 proof that it also contains their misappropriated

13 information or trade secrets.  And at this point, we

14 don't know that it is.  And if they could settle their

15 lawsuit without solving that question, I'm skeptical,

16 quite honestly.

17          MS. TRISKA:  May I respond, Your Honor?

18          THE COURT:  You may.

19          MS. TRISKA:  Thank you.  Attorney Varda

20 referenced that Cloeren's data won't be sold at sale.

21 The notice of sale, as it's currently drafted, still

22 includes the Cloeren hard drives.  We have received

23 nothing in writing assuring us that the Cloeren hard

24 drives won't be sold.

25      Regardless of the Cloeren hard drives though, we

1  are still concerned about the EDI hard drives.  Based

2  on the limited discovery we did in the other action,

3  we still have reason to believe that there is Cloeren

4  data on the EDI hard drives.

5      CFS was engaged to determine whether or not there

6  was Cloeren.  They did about $90,000 of work and so

7  CFS is probably in the best position to let us know

8  whether Cloeren data is on these EDI hard drives or

9  not.  And to date, CFS has not been willing to

10  represent that there is no Cloeren data on the EDI

11  hard drives.

12      And then just two other comments, Your Honor:

13  Again, the website, by itself, is enough.  Several

14  courts have recognized that just a website is enough

15  for general jurisdiction.  If this court is still not

16  sure on the personal jurisdiction issue, I would

17  request additional time to engage in discovery because

18  I have no doubt that through additional discovery, we

19  would be able to establish general jurisdiction.  But

20  regardless, I believe specific jurisdiction still

21  exists in this matter.

22      And then finally, with respect to venue, while it

23  may be that Minnesota is another option, there is no

24  requirement that we file in the best court so long as

25  it meets the requirements for venue, and we do in the

1   Western District.

2          MR. VARDA:  Your Honor, I want to say in open

3   court, and binding upon my client, that we are not

4   going to sell Cloeren hard drives nor the image

5   prepared from them, period.  And having said that in

6   open court, I believe it is binding and I have

7   assurance that they are not going to do that.  All

8   they have to do is withdraw it at the time of sale.

9   They just cross it off the list.

10          THE COURT:  Let me understand.  The hard

11   drives will not be sold?

12          MR. VARDA:  The hard drives from Cloeren will

13   not be sold.  We also prepared an image of those hard

14   drives --

15          THE COURT:  Okay.

16          MR. VARDA:  -- so there are three points that

17   we have to take out.  So everything we received from

18   them will not be sold.  We will hang on to that out of

19   the sale.

20          THE COURT:  So what's left?

21          MR. VARDA:  It would be the images -- hard

22   drives of Extrusion Dies Industries, what they

23   provided for us.  If they want to know the answer of

24   what's on those, if they want to know what's on those

25   drives, they can come and buy it at the sale, then

1  they will have an answer.

2          THE COURT:  Wait.  Now, I'm not that savvy

3  about what's what, but you are saying that nothing of

4  the hard drives that Cloeren produced to EDI goes to

5  CFS for forensic analysis, the forensic images that

6  CFS produced from the Cloeren hard drives, and then

7  the third thing --

8          MR. VARDA:  Well, it's three because there

9  are two hard drives --

10          THE COURT:  Oh.

11          MR. VARDA:  -- so one, two and then the

12  image.

13          THE COURT:  Okay.  So you are saying that any

14  hard drives that were in Extrusion Dies' possession

15  that went to CFS for analysis --

16          MR. VARDA:  Correct.

17          THE COURT:  -- are not excluded from the

18  sale?

19          MR. VARDA:  Are not excluded.  Mr. Oliver and

20  Extrusion Dies provided us hard drives from which we

21  created these images, these forensic images.  They

22  will be the exclusive subject of the sale.  They are

23  the property of those two entities.

24      You know, it's kind of a chicken or the egg

25  situation.  No one can prove whether anything got

1  taken until somebody pays the bill to get the

2  information, but nobody wants to pay the bill, but

3  they still want to argue that something got taken.

4  It's a strange --

5         THE COURT:  In other words, Extrusion Dies'

6  hardware may have all kinds of Cloeren information if,

7  as Cloeren says, Mr. Oliver transferred it from one to

8  the other?

9         MR. VARDA:  Correct.  But Mr. Oliver could

10 just as well have had all of his grandchildren's

11 pictures on his computer at Cloeren and transferred

12 all of them, rather large files, over to his new

13 computer.  That wouldn't be a trade secret of

14 Cloeren's.  He could also have downloaded forms,

15 J-Tech files for catalogues and all sorts of other

16 stuff that he normally used in business that are taken

17 off a series of different websites and saved himself a

18 lot of time.  He could have transferred those over and

19 that wouldn't be a trade secret.

20     Just because somebody transferred something -- I

21 just had to transfer a bunch of stuff between

22 computers because I had a crash -- that doesn't mean

23 that there is anything in the transfer.  People do

24 that all the time.

25     So we are kind of back to the funny situation is

1   nobody wants to pay for it, but nobody wants -- the

2   only way you are going to know whether or not there is

3   anything on that computer is to pay us, but nobody

4   wants to do that, so we are in a very strange position

5   here.

6        I do believe that there is no venue here.  We

7   were not -- even though their dispute is in the

8   Western District of Wisconsin, we didn't do anything.

9   What our dispute here with the materials and

10  everything that we have, no portion of that arose in

11  the Western District of Wisconsin.  It has nothing to

12  do with the Western District of Wisconsin.  It was all

13  in Minnesota.  Stuff was sent to Minnesota.  The

14  Frederickson law firm is in Minnesota.  They hired us.

15  We have a contract with them.

16       That earlier contract, none of this relates to

17  anything done under that earlier contract.  So nothing

18  in this particular dispute -- the sale is going

19  forward in Minneapolis.  No portion of this cause of

20  action -- if we stole some trade secrets from what

21  they sent us, that happened in Minnesota.

22       Nothing happened here, so there is no venue, and

23  so you can either transfer it or dismiss it.  And I

24  think the preference is dismissal because this is a

25  sophisticated group, they knew enough to bring it in

1   Minnesota, and they should have brought it in

2   Minnesota if they didn't want to run into a problem

3   with venue.

4        They have not -- you know, for purposes of this

5   motion, they were supposed to provide evidence

6   demonstrating jurisdiction and venue in the Western

7   District, and I don't think they have done that.  We

8   have heard things here today, but we don't have an

9   affidavit, we don't have any support, nothing in the

10  paperwork.

11       So I think this is one that, you know, should be

12  dismissed for either lack of jurisdiction or venue.

13  And as I said before, I think this is a game of

14  chicken by the Frederickson law firm and I think we

15  will see what happens.

16            THE COURT:  Withstand the poultry metaphor.

17            MR. VARDA:  Yeah.

18            THE COURT:  Ms. Triska, is there anything

19  more you would like to add?

20            MS. TRISKA:  Yes, Your Honor.  Just to try to

21  clarify, in addition to the EDI hard drive, there is

22  also Gary Oliver's personal hard drive.  So regardless

23  of whether he misappropriated the trade secrets on

24  EDI's hard drives, there is still the potential for

25  them to be up on his personal hard drives.  And again,

1    based on discovery that was done in the prior action,

2    we have reason to believe that.

3        Attorney Varda mentioned there is all these other

4    possibilities to explain why he was on

5    *transferlargefiles.com* websites, but there is still

6    the very real possibility that he transferred

7    Cloeren's trade secrets, and the risk to Cloeren is

8    significant.

9        Going forward with the sale of EDI's drives,

10    regardless of Cloeren's, there is still the very real

11    potential that going forward with the EDI's sale of

12    hard drives will put Cloeren's trade secrets at risk.

13        And if there is any additional evidence or

14    evidence that I mentioned today that wasn't in any of

15    my filings, I would be happy to supplement that as

16    soon as possible, within an hour, if that would assist

17    the Court with the jurisdictional question.

18            THE COURT:  I think I'm prepared to rule.  I

19    just don't think that there is jurisdiction in this

20    district and I don't think that venue would be proper

21    here either.  CFS has done this work in Minnesota.

22    Minnesota courts are dealing with it.  I don't think

23    that it's appropriate for this court to get into it

24    given the real questions about jurisdiction and venue,

25    which I think are pretty much in favor of CFS.  It's

1    possible that the website would give this court

2    jurisdiction, but I'm queasy enough about it not to

3    adopt that viewpoint.

4        I think it probably is a game of chicken, that

5    this law firm does not want to pay this money.  EDI

6    doesn't want to pay the money, now that it's settled

7    the lawsuit and it doesn't need the materials anymore.

8    But I think the law firm probably realizes that the

9    stakes were or are high enough that if it doesn't pay

10   this and get these materials out of there, it could

11   really expose itself to some serious expenses either

12   in a malpractice lawsuit or something else.

13       It's a very strange case and I don't know what

14   lesson to draw from it other than maybe people should

15   pay their bills.  In this economy, that's not always

16   what's going to happen.

17       But I'm just not -- I would not be comfortable

18   exercising jurisdiction over CFS in this case and

19   issuing any kind of injunctive relief to the

20   plaintiff, Cloeren, so the motion is denied.  And

21   Cloeren will get back its forensic images and its hard

22   drives?

23            MR. VARDA:  Correct, Your Honor.  The story

24   is even worse.  Apparently they sent an associate out

25   to hire a forensic firm and it might not have reported

1   quite how expensive they said it was going to be.

2          THE COURT:  I gathered that.

3          MR. VARDA:  You can just see how this

4   happened.

5          THE COURT:  But it's still of their agent.

6          MR. VARDA:  Thank you, Your Honor.

7          MS. TRISKA:  Thank you.

8          THE COURT:  Thank you.

9        (Adjourned at 11:25 a.m.)

10                        ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, CHERYL A. SEEMAN, Certified Realtime and

2   Merit Reporter, in and for the State of Wisconsin,

3   certify that the foregoing is a true and accurate

4   record of the proceedings held on the 14th day of

5   April, 2009, before the Honorable Barbara B. Crabb,

6   Chief Judge of the Western District of Wisconsin, in

7   my presence and reduced to writing in accordance with

8   my stenographic notes made at said time and place.

9   Dated this 21st day of July, 2009.

10

11

12

13

14

15                        _____
                                 /s/

16                        Cheryl A. Seeman, RMR, CRR
                          Federal Court Reporter
17

18

19

20

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.
25